MARY L. WESTERMAN v. SUPREME LODGE KNIGHTS OF PYTHIAS, Appellant.

In Banc, June 1, 1906.

1. **INSURANCE: Knights of Pythias.** The Supreme Lodge, Knights of Pythias, is a fraternal beneficiary association, and benefit certificates issued by it to members of its Endowment Rank are to be treated as benefit certificates issued by fraternal beneficiary associations.

2. ————: ————: **Endowment Rank.** The Endowment Rank is not a separate organization or society formed among the members of the Supreme Lodge, Knights of Pythias. It is simply a designation of those of the members of that fraternal beneficiary association who have chosen to apply for and receive the benefit certificates provided for by the association. It is a part and parcel of the association, and the business it transacts is done under the supervision of the association.

3. ———: **Fraternal Beneficiary Association.** It is only essential to constitute a lodge a fraternal beneficiary association that it be organized for the benefit of its members, and not for gain or profit, and have a representative form of government and a ritualistic form of work.

4. ———: ———: **Certificates.** The statute does not contemplate that all members of a fraternal beneficiary association must have benefit certificates of the same kind.

5. ———: ———: **Extended Insurance.** The benefit certificate issued by a fraternal beneficiary association, such as the Supreme Lodge, Knights of Pythias, does not fall within the provisions of the non-forfeiture insurance statute, sec. 7897, R. S. 1899. That statute is limited in its application to regular or old-line insurance companies.

6. ———: ———: **Statute as Interpreted by Executive Officers and Profession.** The holdings of the insurance department and of the legal profession and of the people for more than a quarter of a century after its enactment that the non-forfeiture insurance statute is not applicable to benefit certificates issued by fraternal beneficiary associations, standing alone, fall far short of furnishing satisfactory grounds for so holding; but if other reasons can be assigned why it is not so applicable, they furnish some aid and support to the soundness of those reasons.

7. ———: ———: **Purpose of Statute.** For the purpose of ascertaining the intent of the lawmaker, a court is not confined exclusively to the language of the statute, although its language must be given due weight, but should consider as well the circumstances that led to its adoption, and the evils it was designed to remedy. When this is done, it is competent for the court to declare that a thing which may be within the letter of the statute, is not governed by the statute, because it is neither within its spirit, nor within the intention of the lawmaker. And when this is done in reference to the non-forfeiture insurance statute, it is found that its purpose was to secure to policy-holders the benefit of the reserve on their policies, and not to permit the reserve to be forfeited or appropriated by the insurer. At the time of its enactment there were few companies which issued policies or benefit certificates on what is now commonly known as the "assessment plan," and hence the statute cannot be held to apply to them, so long as they are issued for the benefit of members, and not for gain or profit.

8. ———: **Benefit Certificate: Old Line Insurance: Extension.** The monthly assessments and dues were not unalterably fixed by the contract, nor was the liability incurred by the company definitely fixed and unalterable, but by the constitution,

laws and rules of the association, which are made integral parts of the contract and are the sources of the power for making the contract, the amount of assessments was dependent on stated conditions and the amount to be paid in case of death was dependent on the amount realized from assessments. *Held,* that the policy was not a contract for ordinary regular old-line insurance, and, containing a clause that all liability on the part of the company should cease upon failure of the insured to pay assessments, the policy lapsed when payment ceased, and the non-forfeiture statute in reference to applying the reserve to the purchase of extended insurance does not apply, and the policy having lapsed the beneficiary cannot recover.

9. ————: ————: **Section 7897: Application: Extended Insurance.** The nonforfeiture provisions of section 7897, Revised Statutes 1899, have no application to benefit certificates issued by a fraternal beneficiary association, which does business according to the statutory requirements governing such associations. The holder of such certificate does not have such an interest in any funds in the treasury of the association, collected through assessments, as will permit its application to the purchase of extended insurance after the forfeiture of the policy for failure to pay assessments when due.

10. ————: **Sections 7897 and 7898: Construed Together: Paid-Up Policies: Extended Insurance.** Sections 7897 and 7898, Revised Statutes 1899, cover the same subject-matter and must be construed together. When that is done no holder of an insurance policy can claim the right to extended insurance under section 7897, unless he could have claimed the right to a paid-up policy under section 7898. And as there can be no such thing as a paid-up benefit certificate issued by a fraternal beneficiary association, the provisions of section 7897 in reference to extended insurance do not apply to such certificate.

11. ————: **Benefit Certificate: Application of Insurance Statute.** Whether or not the non-forfeiture statute or any other provisions of the general insurance laws are applicable to benefit certificates issued by a fraternal beneficiary association depends, in part, upon the form of the certificate and the terms of the contract, and in part, upon what provisions of the law are involved. Certain provisions of the general insurance laws may be broad enough to embrace such certificates, but a benefit certificate which complies with the provisions of the laws governing fraternal beneficial associations is not subject to the non-forfeiture provisions of the general insurance laws. [Distinguishing Toomey v. Knights of Pythias, 147 Mo. 129, and Kern v. Legion of Honor, 167 Mo. 471.]

12. ————: ————: ————: **Foreign Association: No Statute: Retrospective Statute.** Simply because there was no statute au-

thorizing a foreign fraternal beneficiary association to do business in this State at the time the benefit certificate sued on was renewed, is no reason for holding that the non-forfeiture provisions of the general insurance laws apply to it. If it was issued (in 1883) at a time when there was a statute authorizing a foreign association to do business here, and after such statute was repealed in 1889 that certificate was surrendered and the other sued on was issued for a larger sum, and afterwards the statute was in 1897 re-enacted, and the holder thereafter for three years paid his assessments, under an agreement that it was subject to the laws of the society then in force or that might thereafter be adopted, and then permitted it to lapse for failure to pay assessments, it will not be held that the statute in reference to extended insurance applies to it, simply because the statute permitting such foreign associations to do business in this State was not in force at the time the certificate was renewed, but, the beneficiary having no vested right in such certificate, her rights thereunder will be determined by the law of 1897, which exempted fraternal beneficiary associations from the provisions of the general insurance laws.

13. ———: ———: Retrospective Laws: Vested Right. The beneficiary in a benefit certificate issued by a fraternal beneficiary association has no vested interest therein, and hence the act of 1897, exempting benefit certificates then in existence from the provisions of the general insurance laws, may be made to govern the rights of the beneficiary under such certificates, without impairing the obligation of the contract or being retrospective.

Appeal from St. Louis City Circuit Court.—*Hon. D. D. Fisher,* Judge.

REVERSED.

*R. P. & C. B. Williams, Reed, Yates, Mastin & Howell, W. M. Williams* and *Martin L. Clardy* for appellant; *Carlos S. Hardy, Charles J. Kavanagh, Benj. D. Smith, De Vere Hall, M. G. Jeffries, A. H. Burnett, W. E. Risse* and *I. M. Earle* of counsel.

(1) Fraternal beneficiary associations, and the certificates issued by them to their members, do not come within the scope or meaning of the act of May 19, 1879, known as the "Non-forfeiture Insurance Stat-

ute," which, in an amended form, is now section 7897, Revised Statutes 1899. The purposes of such societies and their business methods do not bring them or their contracts with their members within the object sought to be accomplished by the Legislature, which was to give to the insured the benefit of the excess in premiums over the costs of carrying the insurance in the earlier years of the policy; nor within the mischief intended to be remedied, which was the appropriation of such excess by the insurance company to its own use in case of default by the insured after the payment of three annual premiums. Mut. Res. Fund Assn. v. Roth, 122 Fed. 853; Conn. Ins. Co. v. Commonwealth, 133 Mass. 164; Masonic Aid Assn. v. Waddell, 138 Mo. 636; Hayden v. Franklin L. I. Co., 136 Fed. 285; Commonwealth v. Beneficial Assn., 137 Pa. St. 412; Fidelity & Cas. Co. v. Freeman, 109 Fed. 856; State ex rel. v. Interstate Inv. Co., 52 L. R. A. 544; Conductors' Assn. v. Kastor, 55 Mo. App. 186; Masonic Assn. v. Bunch, 109 Mo. 560. (2) It is proper in the interpretation of statutes to consider the consequences of any proposed construction. It will not be assumed that the Legislature intended an unreasonable, unfair or unjust result. To apply the "non-forfeiture" statute to fraternal beneficiary associations and their contracts will give to the representatives of deceased members who allow their certificates to lapse, something which was not in the contemplation of the parties at the time the certificates were issued, and for which nothing was paid, and, to make such gratuities, will impose upon the living members additional assessments and burdens which they did not intend to assume, and which the plan, under which the societies are organized, does not contemplate, and will further make it impossible to conduct the fraternal insurance business in this State. Lamar Water & Elec. Light Co. v. City of Lamar, 128 Mo. 210; State ex rel. v. Railroad, 105 Mo. App. 213; Neenan v. Smith, 50 Mo. 525. (3) The first and second sec-

tions of the act of May 19, 1879, must be construed together, and by so doing, it is plainly apparent that the statute was only intended to apply to "Ordinary life policies," "Limited payment life policies," and "Continued payment endowment policies payable at a certain time or at death," and the contract sued on does not come within any of said classes. Laws 1879, p. 130, sec. 2. (4) The non-forfeiture statute should be read in the light of other acts *in pari materia*. The Legislature, by an act approved on the same day as the non-forfeiture law, authorized the organization of such societies as defendant, and provided a system of rules for their government, and since that time there have been special statutory regulations controlling the business of these associations by different rules from those applicable to ordinary life insurance companies. This is apparent from the act of 1881, the act of 1887, the statute of 1889 and the act of 1897. The legislation of this State, as was said by the Supreme Court of Illinois, in construing the statutes of that State, demonstrates that, "When mutual benefit societies began to be organized and that form of life insurance came into use, it became apparent that it would be impracticable subject those societies to the same ruling and regulations already in force for the government of the business of life insurance, and that essentially a new system of rules was required." Mut. Ben. Ass'n v. Robinson, 35 N. E. 174; State v. Whitmore, 75 Wis. 332; Commercial Ass'n v. People, 90 Ill. 166. (5) The language of the "non-forfeiture" act, in connection with the requirements prescribed by the statutes for the organization and admission of the different classes of insurance companies into this State, precludes the idea that fraternal beneficiary associations were within the intention of the Legislature in passing said "non-forfeiture" law. (6) Defendant and other societies of like character have been issuing benefit certificates

to their members in Missouri for years. The Insurance Department has never demanded that such associations comply with all the statutory requirements imposed upon regular insurance companies engaged in the life insurance business in the State, and it is well known that such associations could not do so. Many provisions are inapplicable to them. The act, first enacted in 1869, requiring the valuation of "all outstanding policies," etc., of life insurance companies, which respondent insists is to be read in connection with the "non-forfeiture" law and claims to be equally applicable to such associations, has never been applied to these benevolent societies by the Insurance Department, and the nature of their certificate and their plan of business make it impossible to do so. The Legislature could never have intended to apply the valuation law to these certificates. The practical construction placed upon a statute by the officers charged with the duty of enforcing it, and which has continued for years, is entitled to great weight in determining its meaning. Ross v. Railroad, 111 Mo. 18; Lewis's Sutherland, Statutory Construction (2 Ed.), sec. 474. (7) It does not follow that, because some provisions of the general insurance laws, in the absence of an express exemption, might be applicable to the benefit certificates issued by fraternal beneficiary associations, therefore, other provisions, wholly incompatible with the existence of such societies and the character of contracts issued by them, and which would utterly destroy their business, were intended for such associations. Sams v. Railroad, 174 Mo. 69. (8) Assuming that the non-forfeiture law was, and continues to be, applicable to the certificate of membership sued on, the certificate had no net value after June 10, 1899 (date of lapse), because: (a) The term "policies on life," used in the non-forfeiture statute, includes all forms of policies for the whole of life, and the "net value" referred to in the statute is the net value of the kind of policy to be

valued. There can hardly be any question that the certificate in suit is not an "ordinary life policy," but is a monthly, renewable, term contract, and computed on the standard designated by the statute, such character of contract had no net value after June 10, 1899 (date of lapse). The Missouri statutes do not erect an arbitrary standard requiring the valuation of all kinds of policies the same as ordinary life policies. (b) The present value of the future insurance and the present value of the future payments under the certificate were always the equivalent, and there could be no net value to the certificate sued on. Mut. Reserve Life Ins. Co. v. Roth, 122 Fed. 853; Conn. Ins. Co. v. Commonwealth, 133 Mass. 161; N. Y. L. I. Co. v. Stratham, 93 U. S. 24; People v. Sec. Ins. Co., 34 Am. Rep. 528; Ins. Co. v. Heidel, 8 Lea 488; Ins. Co. v. Mathews, 8 Lea 499; Reefe v. Ins. Co., 76 Mo. 603; Rumbold v. Penn Mut., 7 Mo. App. 73; State v. Sheets, 52 L. R. A. 544; Rosenplanter v. Prov. Assn., 91 Fed. 733; Rosenplanter v. Prov. Assn., 96 Fed. 723; McDonald v. Ala. Gold. L. I. Co., 85 Ala. 408; Bankers Life v. Howland, 30 Ins. L. J. 193; Haydel v. Mut. Reserve, 104 Fed. 718; Haydel v. Mut. Reserve, 98 Fed. 200; Wylie's Principles & Practice of Life Insurance, p. 11; Smith's Notes on Insurance, p. 31; Hayden v. Franklin Ins. Co., 136 Fed. 283. (9) The certificate in suit is not a whole or ordinary life contract with a fixed or level premium during life, but is a term contract from month to month, the amount to be paid by the member to be fixed or determined from time to time, by the necessity of the association, to pay off the death claims as they may arise. Ijams v. Ins. Co., 185 Mo. 498; Hanford v. Assn., 122 Mo. 50; Elliott v. Des Moines Ins. Co., 163 Mo. 132; Mut. Reserve Life Ins. Co. v. Roth, 122 Fed. 853; Jacobs v. Life Assn., 146 Mo. 523; Baldwin v. Prov. Sav. Life Assn., 23 App. Div. 5; Baldwin v. Prov. Sav. Life Ass'n, 162 N. Y. 636; Fullenwider v. Royal League (Ill.), 54 N. E. 485;

Fullenwider v. Royal League, 13 Ill. App. 321; Barbot v. Mut. Res. Assn., 100 Ga. 681; Ebert v. Assn., 83 N. W. 506; Miller v. National Council (Kan.), 76 Pac. 830; Messer v. A. O. U. W., 180 Mass. 321; Mut. Reserve Assn. v. Taylor, 99 Va. 208. (10) The act of 1881, page 86, expressly exempted fraternal beneficiary associations from the general insurance laws of the State. $3,000 of the $5,000 mentioned in the certificate sued on were obtained in 1883, while that law was undoubtedly in force. Defendant society was authorized to change its by-laws, rules and regulations. There was no vested right in the plaintiff in the certificate until the death of her husband in 1900. The Supreme Lodge, Knights of Pythias, complied with the act of 1897 immediately after its passage, and thereafter continued to do business in this State under the terms of said act, and plaintiff's husband continued to make payments upon his certificate thereafter until he allowed the same to lapse June 10, 1899. This statute was in force at the time of the lapse and at the time of his death, and must control in an action upon this certificate. Morton v. Royal Tribe of St. Joseph, 93 Mo. App. 78; McDonnell v. Ala. L. I. Co., 85 Ala. 412; Rosenplanter v. Provident Society, 91 Fed. 732, 96 Fed. 721; Miller v. Am. Mut. Co., 21 S. W. 43; Ins. Co. v. Cushman, 108 U. S. 65; Wright v. Minn. Mut. Life Ins. Co., 193 U. S. 657; Ewell v. Daggs, 108 U. S. 143; Gross v. Mtge. Co., 108 U. S. 477; Butler v. Assn., 97 Tenn. 679; Lewis v. McIlvain, 16 Ohio 347; Trustees v. McCaughy, 2 Ohio St. 152; Masonic Aid v. Bunch, 109 Mo. 560; Wells v. Mutual Ben., 126 Mo. 638; Supreme Council v. Kacer, 96 Mo. App. 102; Grand Lodge v. Reneau, 75 Mo. App. 409. (11) The defendant is incorporated as a fraternal beneficiary association by an act of Congress, and is authorized to do business as such in the State of Missouri, and was not authorized by its charter to engage in, nor was it engaged in, the insurance business so as to bring it

within the general insurance laws of the State, of which section 5856, Revised Statutes 1889, is a part. Commonwealth v. Ben. Assn., 137 Pa. St. 412; Morton v. Royal Tribe of St. Joseph, 93 Mo. App. 78; Larker v. Royal Frat. Union, 95 Mo. App. 353; McDermott v. Modern Woodmen, 71 S. W. 833; Dickinson v. A. O. U. W., 159 Pa. St. 258; Johnson v. Railroad, 163 Pa. St. 127; Lithgow v. Supreme T. K. of M., 165 Pa. St. 292.

*Butler & Walsh, Frederick H. Bacon* and *John E. McKeighan* for respondent.

(1) The appellant Supreme Lodge, Knights of Pythias, in legal contemplation, is a life insurance company; and the contract sued on, legally speaking, is a policy of life insurance for the whole of life. State ex rel. v. Merchants' Exchange, 72 Mo. 146; Toomey v. Supreme Lodge, 147 Mo. 129; National Union v. Marlow, 4 U. S. App. 95, 74 Fed. 775; Logan v. Fidelity & Casualty Co., 146 Mo. 122. (2) It is an elementary proposition that the statutes of the State, in force at the time a life insurance policy was issued, form a part thereof to the same extent as if fully recited therein. Kern v. Sup. Council, 167 Mo. 471; Logan v. Fid. & Cas. Co., 146 Mo. 122; Knight Templars & Masons Life Indemnity Co. v. Jarman, 187 U. S. 197, 23 Sup. Ct. Rep. 168; New York Life Ins. Co. v. Cravens, 178 U. S. 389. (3) The positive requirements of the statutes cannot be waived; and any portion of the contract in violation of the statute, even though consented to by the parties, is void. The provisions of the laws of Missouri, in regard to non-forfeiture of policies, cannot be waived, because the language of the statute is that the law shall govern, "anything in the policy to the contrary notwithstanding." N. Y. Life Insurance Co. v. Cravens, 178 U. S. 389, affirming Cravens v. New York Life Ins. Co., 148 Mo. 583; Equitable

Life Assn. Co. v. Clements, 140 U. S. 226; Smith v. Mut. Ben. Life Ins. Assn., 173 Mo. 329. (4)  From a review of the insurance legislation of the State, it is plain: (a) That the business of regular life insurance can only be conducted in this State in the manner provided for by the statutes, that is, by companies which have complied with the requirements of law.  (b)  All life insurance organizations must maintain a reserve as required by statute as one of the conditions precedent to doing business.  (c)  All policies are subject to the non-forfeiture law, and non-payment of a premium after the policy has been in force three, formerly two, years, does not forfeit the rights of the insured.  (5) The statute creates an arbitrary standard of valuation and method of computing the net value, or reserve, and creates a legal liability without regard to the form of the contract or the nature of the organization. It makes no exceptions and no company is exempt unless there is by a subsequently enacted statute an express exemption.  No exception is found in the statute.  (6) The statute is reasonable, its language is plain, and there is no reason why it should not be enforced. Where the language of a statute is plain, the courts cannot construe it so as to abrogate its requirements because of any supposed inconvenience that will result.  The statute in question is plain and explicit.  McCluskey v. Cromwell, 11 N. Y. 601; French v. Spencer, 21 How. 238; Yturbide v. U. S., 22 How. 290; Denn v. Reid, 10 Pet. 527; Ref. Co. v. Sulzberger, 157 U. S. 1; Tynan v. Walker, 35 Cal. 634; 23 Am. and Eng. Ency. Law (1 Ed.), 303; Rector v. U. S., 143 U. S. 457; State v. Brawner, 15 Mo. App. 597.  (7)  A due regard for public policy demands the construction of the statute contended for.  (8)  It is immaterial whether this appellant is an assessment company or a fraternal beneficiary association.  Nat. Union v. Marlow, 4 U. S. App. 99; Kern v. Sup. Council, 167 Mo. 471.  (9)  The appellant corporation is neither a fraternity nor an

assessment company, but is engaged, so far as this contract is concerned, in the simple business of life insurance, and, therefore, is subject to the statute. Jacobs v. Ins. Assn., 146 Mo. 523; Folkens v. Ins. Co., 72 S. W. 720. (10) The history of the business of life insurance, whether conducted by fraternities, assessment companies, or regular life insurance companies, demonstrates the wisdom of the Legislature, and that the only safe plan of life insurance is that laid down by the statutes.

FOX, J.—This cause is here upon appeal by the defendant from a judgment rendered by the circuit court of the city of St. Louis for the sum of $5,236.27.

A statement of this cause was made in Division One of this court prior to its transfer to Court in Banc. The statement is substantially correct and with the permission of my colleagues it will be here adopted.

This is an action commenced in the circuit court of St. Louis on the 16th day of May, 1900, to recover the sum of $5,000 on a policy of insurance, as the plaintiff designates it, or a certificate of membership, as the defendant styles it, issued by the defendant to J. P. Westerman, the husband of the plaintiff, on the 19th day of May, 1893. There was a verdict and judgment for the plaintiff in the lower court and the defendant appealed.

The petition alleges that the defendant is a corporation, doing business in this State, pursuant to the laws thereof; that on the 25th day of January, 1900, she was the wife of said J. P. Westerman; that on the 13th of August, 1883, in consideration of the payment, by the said Westerman, to the defendant, of a premium of $39.60 annually through his natural life, the defendant executed and delivered to said Westerman its policy of insurance in writing, whereby it insured his life in the sum of $3,000 for the benefit of the plaintiff; that on May 12, 1893, in consideration

of an additional premium of $39, making a total annual premium of $79,60, to be paid annually through his natural life, the defendant, executed and delivered to said Westerman its policy of insurance for an additional sum of $2,000, the first policy being taken up and cancelled, and the new policy for $5,000 being issued to said Westerman for the benefit of the plaintiff; that on the 25th of January, 1900, said Westerman died; that up to the 10th of June, 1899, said Westerman duly paid all premiums on said policy, but, on said date, he made default in the payment of such premiums; that up to the time of said default, he had complied with all the conditions and provisions of said policy; and that at the date of said default there was a net value in the policy of $336, which with four per cent added, made a total value of $334.44, three-fourths of which, to-wit, $262.08, was sufficient for a net single premium for temporary insurance for the full amount written in the policy, and that said policy was in full force at the time of the death of said Westerman; that said death was not caused by any of the exceptions to liability specified in the policy; that within a reasonable time, to-wit, 23d of March, 1900, plaintiff gave to defendant notice of the death, and demanded payment of the amount of said policy, which the defendant refused to pay, and judgment is asked for $5,000, with interest from the date of the proof of loss.

The answer denies all allegations of the petition, except the death and the default of the payment of the premium, and then contains the following affirmative defenses, to-wit:    First, that the defendant is a fraternal, benevolent association created by an act of Congress of January 28, 1894, and at the date of the issuance of the policy or certificate aforesaid, it was doing business in the State of Missouri, as such association, by authority of the State, and has continued to do so ever since; that it is a corporation organized and carried on for the sole benefit of its members and other

beneficiaries, and not for profit; that it has a lodge system with ritualistic form of work and a representative form of government, and through a branch, known as the Endowment Rank, operated a board of control, under the direction of defendant, issues benefit certificates to the members alone of said defendant; that the funds from which the payment of such benefits is made, and the funds for the expense of the defendant are derived from dues, assessments or monthly payment collected from its members; that the payments of death benefits, by the laws of the defendant, is limited to the families, heirs or blood relatives of its members; that in addition to said monthly payments and dues, section 4 of article 2 of its constitution, general laws, rules and regulations, which was in force at the date of the issuance of the policy or certificate, provided as follows:

"The board is hereby empowered to establish a table of rates, and, whenever deemed necessary, adjust the same, to be graded in accordance with the member's age at the date of admission and endowment held or applied for; such table of rates to be at all times applicable to the entire membership in force, and to be applied as the board may from time to time direct. The board is authorized to make special assessments upon all members of the Endowment Rank, when necessary to meet the liabilities of the rank."

That on the 19th day of May, 1893, it issued to said Westerman its certificate, based upon the application of said Westerman, which was in words and figures as follows, to-wit:

"Endowment Rank of the Order of Knights of Pythias.

"This certificate witnesseth: That J. P. Westerman is a member of Section No. 457 of the Endowment Rank, Knights of Pythias of the World, said membership being based upon evidence that he is a member in good standing of a subordinate lodge of the order

of Knights of Pythias, and upon the declarations, representations and agreements made in his application, bearing date of May 17, 1893, and the statements certified by him therein to the medical examiner, which application is filed in the office of the board of control of the Endowment Rank, and made a part of this contract. 8—13—83.

"In consideration of the payment by said member of the prescribed admission fee and the payments hereafter to said Endowment Rank of all monthly payments, assessments and dues as required, and the full compliance with all the conditions herein contained, and with the laws governing this rank now in force, or that may hereafter be enacted by the Supreme Lodge, Knights of Pythias of the World, or the board of control of said rank, and shall be in good standing, under said laws, the board of control of the Endowment Rank, Knights of Pythias of the World, will pay to Mary L. Westerman, his wife, the sum of $5,000, out of the endowment fund of the rank, in accordance with and under the laws governing the payment of benefits, upon due notice and satisfactory proof of death, and a full receipt and surrender of this certificate, subject, however, to the conditions, restrictions and limitations subscribed to by said member in his application, and to the further conditions and agreements hereafter named; and provided, also, that this certificate shall not have been surrendered by said member, or cancelled at his request, and another certificate issued in accordance with the laws of the rank.

"Provided, further, that the beneficiaries herein designated shall acquire no interest whatever in the certificates, nor in the Endowment Fund, until the benefit shall have lawfully accrued by reason of the death of said member and no subsequent change in the beneficiary shall have been made. In case of the death of said beneficiary during the lifetime of the member, the benefit accruing under this certificate shall be pay-

able as provided for in article 6, section 1, of the general laws of the Endowment Rank.

''And it is understood and agreed that any violation of the within-mentioned conditions of the requirements of the laws now or hereafter in force governing this rank shall render this certificate and all claims thereunder null and void, and the said Endowment Rank shall not be liable for the above sum or any part thereof.

''In witness whereof we have hereunto subscribed our names. and fixed the seal of the Supreme Lodge, Knights of Pythias of the World, at Chicago, Illinois, this 19th day of May, 1893.''

Attached thereto was the following: ''I hereby accept this certificate of membership, subject to all the conditions therein contained. J. P. WESTERMAN.''

The parts of the application bearing upon this case are as follows:

''It is agreed by myself, and binding upon all parties who may hereafter become interested . . . that if there shall be any failure or neglect to pay any assessment, monthly payments or dues as prescribed by the laws of the rank or order, or severing in any manner whatever my membership or connection with the order, or the Endowment Rank, said certificate shall be null and void, and all right, title and interest in and to the same, as well as the rights of my heirs and beneficiaries to the benefits and privileges accruing to members in good standing of this rank, shall be forfeited.''

And it was further provided: ''In addition to the above provisions, I hereby agree that I will be governed, and this contract shall be controlled by all the laws, rules and regulations of the Supreme Lodge, Knights of Pythias, and the board of control of the Endowment Rank now in force, or that may hereafter from time to time be enacted by said Supreme Lodge or board of control, or submit to the penalties thereon

contained.   To all of which I willingly and freely sub-scribe.''

The answer further alleges that said Westerman was required to pay the sum of $6.55 per month on or before the 10th of each month, and such other assessments as the defendant might require of him; that said laws, rules and regulations further provided that the monthly payments and dues should be made to the secretary of the section, without notice, and a failure to pay the same by the 10th of each month should work a forfeiture of all right, title and interest in and to the certificate of endowment, but that the member might regain his membership by making application, paying a membership fee, standing a medical examination and get a new certificate at the rating provided for his then age; that Westerman made default in May, 1899, and thereby forfeited all rights under the certificate; that the defendant is a corporation, organized and carried on for the sole benefit of its members and other beneficiaries, and not for profit, and has a supreme government consisting of three independent, coordinate departments, namely, a legislative department, an executive department and a judicial department; that it has a system of subordinate lodges, a grand lodge and a supreme lodge (but this system does not obtain as to the Endowment Rank); that in consequence of the default of said Westerman he forfeited all rights under the certificate.

The reply denies all allegations of the answer except those specifically admitted, and then, after admitting the incorporation of the defendant, alleges that the Endowment Rank issues certificates of insurance which stipulate the payment of a certain specified sum on the death of the insured to a certain beneficiary, named in the certificate, on the payment of certain fixed monthly payments collected from members of the Endowment Rank; that section 4 of article 2 of the constitution, general laws, rules and regulations, is in opposi-

tion to the general terms of the contract or certificate
of insurance issued by the defendant, and to the laws
of the State of Missouri, and is therefore void; denies
that defendant had the power to enforce the provisions
of the application which provided for a forfeiture of
the certificate in case of a failure to pay the assess-
ment, monthly payments or dues; denies that section
1 of article 4 (which required said Westerman to pay
$6.55 per month and such other assessments as may
be required of him by the defendant), did or could
bring the defendant within the definition of an assess-
ment company, or give the defendant any standing,
right or privilege as an assessment association; alleges
that section 7 of article 4, providing for monthly pay-
ments and dues and for a forfeiture of the certificate
and rights thereunder in case of a failure to pay the
same and further making provisions for reinstatement,
is a valid or legal rule of law of the association, and
alleges that it is repugnant to the laws of Missouri,
under the form of certificate issued by the defend-
ant to Westerman, and is therefore void; admits that
Westerman made default in his monthly payments in
June, 1899, but denies that such default worked a for-
feiture of his rights; denies that defendant is organized
for the sole benefit of its members and other benefic-
iaries, and not for profit; denies that any part of the
workings of the subordinate lodge is applicable to this
case, or that the Endowment Rank has any fraternal
features, and alleges that the defendant, through its
Endowment Rank, was doing a regular insurance bus-
iness, and was not operating on a fraternal, benevolent
plan or assessment plan, but is an old-line life insur-
ance company, and alleges that the certificate of insur-
ance issued to Westerman was a regular old-line life
insurance policy; and alleges that the funds of the En-
dowment Rank are secured only from members of that
rank who hold certificates of insurance, and that no
member of the order of Knights of Pythias who is not

a member of the Endowment Rank, and a holder of a certificate of insurance, is in any way a contributor to the funds of the Endowment Rank, and that the membership of the Endowment Rank is a small proportion of the entire order of Knights of Pythias, and exists separate and distinct from the main body of the order.

The case made is this: The parties stipulated as follows:

"It is hereby stipulated and agreed that the Supreme Lodge, Knights of Pythias, through its Endowment Rank, under the operation and control of the board of control of defendant, is authorized by the Superintendent of Insurance of the State of Missouri, to do business in the State of Missouri as a fraternal, beneficiary association, and at the time of the death of Jacob Westerman, in whose favor the certificate here sued on was issued, and long prior thereto, the defendant was authorized by the said Superintendent of Insurance to do business in the State of Missouri as a fraternal, beneficial assocation. It was further admitted that the premiums on the policy, amounting to $6.55 per month were paid by said Westerman until June 9, 1899; that the certificate or policy sued on, were in the terms hereinbefore set out."

The plaintiff then called as a witness William F. Ryan, an insurance actuary and accountant. He testified that he was conversant with the American experience table referred to in the statutes of this State, and that he had made a calculation of the net value of said certificate or policy, at the time of the default in payment by said Westerman. He further testified that he had figured the net value of the policy "on the basis of the American experience table of mortality with four and one-half per cent compound interest as prescribed by our statutes, and I will take three-fourths of that net value and use it as a single premium for temporary or term insurance according to the rule laid down there.

I would assume the same table of maturity and the same rate of interest on the temporary or term insurance was to be furnished or charged at temporary rates. The net value of the policy, computed by that rule, which is the present value of the contract, payable, certainly, at death, less the present value of the future net premium, which the contract entitles them to calculate, and I find that the net value would be $1,385, three-fourths of that net value amounts to $875.64. . . . The temporary premium for $5,000, computed by the same rule for eleven years is $189.43, and for twelve years is $207.20. Taking the mean average the calculation results as follows: the total extension is eleven years and one hundred and seventeen days from the date of lapse, which was in June, 1899.''

On cross-examination the witness testified that the payment of $78.60 per year, which was the amount Westerman paid on this policy, would not create a reserve sufficient to carry the policy for eleven years and one hundred and seventeen days, unless the Endowment Rank managers had found some way to make five per cent compound interest thereon.

The witness was then asked by the Court: ''How long could they carry it, if they did not make ·that amount?'' And he answered: ''As a matter of fact, at that rate, the company were not solvent from the beginning and is not solvent now. That is, if you measure its future liabilities. You asked if they did not make that much money, how long could they carry it?'' The Court: ''Yes, sir.'' Answer: ''Just as long as the receipts exceeded the disbursements.''

The witness further testified that in making his calculation he had proceeded upon the theory that the policy was a whole-life policy, and had not taken into account at all the amount of premiums paid, but had calculated the net value of the policy according to the

statutory requirements, and that he did not include anything for expenses or profits in the calculation. He further testified as follows:

"Q. Explain what you mean by net amount. A. By net rate we exclude all expenses of management or carrying investments: It means actual amount that will be required to pay the death losses, if they happen, in accordance with that table, and that sum is invested at four and one-half per cent, and it also excludes, on the other hand, any savings or gains that may arise from the fact that the company might make more than four and one-half per cent interest, and also the further fact that the company might have thirty-five, forty or sixty per cent to pay the mortality experience, in which case there is a profit; so I exclude expenses, and there is excluded in that also any profits or savings."

He further testified: "That some companies added twenty per cent, some twenty-five per cent and some as high as forty per cent upon that price to provide for expenses, and so on," and that the defendant had never published its death rate, and he had never been able to ascertain what it was.

He further testified that at the age of 48, the net rate for one year is $11.95; at the age of 49, $12.54; at the age of 50, $13.92; at the age of 51, $13.91; at the age of 52, $14.73; at the age of 53, $15.63, and that according to the actuary's table four per cent at the age of 48 the net cost or premium would be $13.71; at 49 would be $14.48; at 50 would be $15.53; at 51 would be $16.25; at 52 would be $17.26; at 53 would be $18.36.

The plaintiff then called as a witness Ben W. Dalzell, who testified that he was the general organizer of the Endowment Rank for the State of Missouri, and, as such, was president of the board of control; that in order to become a member of the Endowment Rank one had to be a member of a subordinate lodge, to make a formal application, and to pass a medical examination; that the Endowment Rank was made up of sec-

tions of the subordinate lodges, each section having the power to elect a president, vice president and secretary; that the secretary received the dues and transmitted them to the Supreme Lodge; that the Endowment Rank had made a special assessment on the 15th of May, 1901, and had only made one other special assessment, which was in 1892; that the assessments could be paid monthly, quarterly or annually.

The witness identified a circular which had been issued by the Endowment Rank, which recited that: "The system of the Endowment Rank is based upon actual cost of insurance during expectancy of life, divided, for convenience, into monthly payments determined by the applicant's age at the time of obtaining membership," and that the secretary received five cents per thousand for collecting and transmitting the monthly dues, and that the monthly assessments indicated the entire cost of insurance, subject to the right to increase the same, and subject, also, to the right to make special assessments when the emergency required or when the benefit fund ran low.

He further testified that special assessments were not made for the purpose of paying any specific claim, but for replenishing the benefit fund.

On cross-examination he testified that defendant had a surplus of $350,000 invested, and that the Endowment Rank of the defendant is a branch of the defendant that has control of the insurance and payment of certificates and is under the direction of a board of control consisting of seven members, who are elected by the Supreme Lodge; that the defendant is a secret society, has a lodge system, a ritualistic form of work and a representative form of government; that the funds from which the certificates are paid are derived alone from monthly payments, assessments and dues, which are collected from the members of the Endowment Rank, and not from the members of the order generally, and said benefits are payable to the heirs or

blood relatives of members, and that the order is carried on for the sole benefit of members and other beneficiaries and not for profit; that the monthly payments are collected each month in advance; that there is no ceremony connected with the Endowment Rank, and no initiation services.

The witness further testified, with reference to the Endowment Rank, as follows:

"The Court: What ritualistic form of work does a party who is a member of the Endowment Rank perform in that rank? A. None other than any other member. The Court: What is the work in that rank? A. The Endowment Rank? The Court: Yes, sir. A. It is simply a business proposition. The Court: No ceremonies connected with it? A. Not at present. There was at one time a regular ritual with that, but that is done away with. The Court: The ritual is with the other order? A. Yes, sir."

"By Mr. Walsh: Q. Does membership in a subordinate lodge entitle a member in good standing in the subordinate lodge to any right or privileges for his beneficiaries in the Endowment Rank, the same as is given to the certificate holder of a policy issued by the Endowment Rank or board of control? A. Certainly not."

The defendant called as a witness Julian C. Harvey, a consulting actuary, who testified that he had examined the certificate in this case, and that taking into consideration the premium paid, and the assumed table of mortality, and the rate of interest, there would be no reserve value of the policy, and therefore no net premium with which to purchase temporary or extended insurance.

On cross-examination as to how the policy was valued, he answered: "Under the statutes the whole-life policy annual premium, I would ascertain the net single premium at the attained age, multiply the premium to be received at the age, by a life annuity, and

the same rate of interest and take the difference and it would give you the mortuary reserve required under the statutes. Q. Now, I would like you to take this policy which you have here, and make your computation with reference to that policy, assuming that it is an all-life policy issued in 1893 at the age of 48? A. On that assumption, the reserve would be at the age of 48, six years after issuance, $596.40 for a $5,000.00 policy, American, four and one-half per cent. . . . Q. Now in making that calculation have you taken into consideration the fact that the difference between the net premium charged by this insurance company, or Endowment Rank, is less than is charged under the American experience table, four and one-half per cent? A. I did not take the premium into consideration at all. I made the calculation on the assumption that this is a whole-life policy issued at the age of 48, for $5,000, premium payable annually." On redirect examination the witness testified: "In calculating the value of the policy, we do not pay any attention to the premium paid," that is, in making the calculation under the statute.

The defendant also introduced in evidence the public acts under which it was incorporated, which showed that it was created by an Act of Congress, as a beneficial association on the 5th day of August, 1870; that its charter was amended in October, 1875, and again in March, 1882, and was reincorporated by an Act of Congress approved June 29, 1884; that the amendatory act of 1882 conferred upon the defendant the right to establish the Endowment Rank, "upon such terms and conditions, and governed by such rules and regulations, as to the Supreme Lodge may seem proper;" that at the annual meeting in 1892, a constitution for the government and control of the Endowment Rank was adopted, and a board of control created for that rank; that the constitution so adopted contained section 4 of

article 2, hereinbefore set out, as a part of the defend-
ant's answer, and also section 1 of article 4, which pro-
vided that every applicant for admission to the Endow-
ment-Rank should pay, monthly, an amount provided in
the table graduating the monthly payments at a sum
from seventy cents to eight dollars per month, accord-
ing to the age of the member, for certificates ranging
from $1,000 to $5,000, and should continue to pay the
same amount each month thereafter, as long as he re-
mained a member of the Endowment Rank, unless
otherwise provided for by the Supreme Lodge or the
board of control of the Endowment Rank; that said
constitution also contained section 2 of article 4, here-
inbefore referred to, which provided that a failure to
pay monthly dues should cause a forfeiture of all
rights under the certificates, and that the membership
might be regained in the manner hereinbefore referred
to; that section 3 of article 6 of said constitution fur-
ther provides as follows:

"If at the time of the death of a member of the
Endowment Rank, the proceeds of one monthly pay-
ment by all the members of said rank, shall not be suffi-
cient to pay in full the maximum amount of the endow-
ment held under the certificate of said deceased mem-
ber, then there shall be paid to the beneficiaries, an
amount equal to the proceeds of one monthly payment
by all the remaining members of said Endowment
Rank, less ten per cent for expenses; and the payment
of said sum, to the beneficiaries, shall be in full of all
claims and demands, under and by virtue of said cer-
tificate."

The defendant further showed that the laws relat-
ing to the Endowment Rank were subsequently amend-
ed by the Supreme Lodge in 1894, 1896 and 1898, prior
to Westerman's death and prior to his failure to make
the monthly payment due in June, 1899. These amend-
ments consisted in requiring members of the Endow-

ment Rank to pay five cents for each $1,000 insurance held by him, each month, in addition to the amounts required by the table of rates, and in further providing that if any part of the fund was not required to meet accruing liabilities, it should be invested by the board of control, and in further providing that special assessments should be governed by the same rules and regulations as governed the collection of monthly payments, except that they should be issued on the 15th of each month, and be payable within thirty days.

Further changes were made authorizing higher rates to be charged where the occupation of the insured was hazardous or extra hazardous.

The defendant then read in evidence the deposition of Chas. F. S. Neal, who testified that he was the president of the board of control of the Supreme Lodge, Knights of Pythias. He described the formation of the order of Knights of Pythias and the Endowment Rank substantially as testified to by Dalzell, and then said that the Endowment Rank had no reserve fund, and created no reserve fund, and was not obliged so to do; that the only funds avaliable to the Endowment Rank for the payment of certificates were derived from monthly payments, dues and assessments upon members of the Endowment Rank; that a special assessment had been made upon all members of the Endowment Rank in addition to the monthly payments, on the 15th of July, 1892, and on the 15th of May, 1901.

He further testified that members of the defendant order, who were not holders of policies, were not affected in any way by the Endowment Rank; that the Endowment Rank is a branch of the Supreme Lodge; that the Supreme Lodge is not liable at all for the indebtedness of the Endowment Rank; that according to the last annual report the assets of the Endowment Rank were $453,822.85, and cash $35,772.97; that this was not in excess of its liabilities; that the expendi-

tures for the quarter were $398,897.81; and after this disbursement there remained the investment above, making cash and investments $489,595.82. On cross-examination, he testified that the membership of the Knights of Pythias was, in round numbers, 500,000, and that 67,000 or 68,000 of this number belonged to the Endowment Rank.

At the close of the plaintiff's case, and again at the close of the whole case, the defendant demurred to the evidence. The court overruled the demurrer and the defendant excepted. At the request of the defendant the court gave the following instructions:

"1. The court sitting as a jury declares the law to be, that it devolves upon the plaintiff to establish by a preponderance of the evidence that on the 10th day of June, 1899, there was a net value of the certificate sued on, which, with four per cent added, made a total value of said certificate, at said time, of $344.44, or, a sufficient amount, three-fourths of which as a net single premium for temporary insurance for the full amount of the policy or certificate here sued on, would carry said certificate until the 25th day of January, 1900, the time of the death of the said J. P. Westerman.

"5. The court sitting as a jury declares the law to be, that if the defendant is authorized to do business in the State of Missouri, as a fraternal, beneficial association, and does said business in the State of Missouri, and is not engaged in the business of life insurance, and is not so authorized to do business in this state, under the laws thereof, then there should be a verdict and judgment for the defendant."

The court refused to instruct, as the defendant asked, that the certificate sued on is not an insurance contract for the whole life of the insured, but is only a contract of insurance for such period as the monthly payments of premiums set out in the table of rates then in force would carry or continue said policy, and that it

had no net value under the laws of the State; and further refused to declare that the evidence of the witnesses as to the net value at the time of the default was irrelevant and immaterial and should be excluded; and further refused to declare that the policy had any net value which could be used for the purpose of extended insurance; and further refused to declare that the certificate or policy sued on is not such a certificate or policy as is referred to in the non-forfeitable provisions of the statute of this State, and that, "unless the policy or certificate is such a policy or certificate as the laws of the State of Missouri require shall carry a reserve to the benefit of the policy holders, then there is no value of said policy to the holder thereof upon his default to pay the assessment or payment required."

Upon the submission of the cause to the court the finding and judgment was for the plaintiff and judgment assessed as heretofore indicated. Motions for new trial and in arrest of judgment were timely filed and by the court overruled. From this judgment defendant in due time and proper form prosecuted its appeal to this court and the record is now before us for consideration.

OPINION.

It is apparent from the record in this cause that there is practically but one question presented for consideration, that is, whether section 7897, article 2, chapter 119, Revised Statutes 1899, applies to fraternal beneficiary associations, or is its application limited to regular or old-line insurance companies? At least, this is the overshadowing proposition confronting us and a correct and proper solution of it settles this controversy. Section 7897, Revised Statutes 1899, provides as follows:

"No policies of insurance on life hereafter issued by any life insurance company authorized to do busi-

ness in this state, on and after the first day of August,
A. D. 1879, shall after payment upon it of three annual
payments, be forfeited or become void, by reason of
non-payment of premiums thereof, but it shall be sub-
ject to the following rules of commutation, to-wit: The
net value of the policy, when the premium becomes due,
and is not paid, shall be computed upon the actuaries'
or combined experience table of mortality, with four
per cent interest per annum, and after deducting from
three-fourths of such net value, any notes or other evi-
dence of indebtedness to the company, given on account
of past premium payments on said policies, issued to
the insured, which indebtness shall be then cancelled,
the balance shall be then taken as a net single premium
for temporary insurance for the full amount written in
the policy; and the term for which said temporary in-
surance shall be in force shall be determined by the
age of the person whose life is insured at the time of
default of premium, and the assumption of mortality
and interest aforesaid; but, if the policy shall be an en-
dowment, payable at a certain time, or at death, if it
should occur previously, then, if what remains as afore-
said shall exceed the net single premium of temporary
insurance for the remainder of the endowment term for
the full amount of the policy, such excess shall be con-
sidered as a net single premium for a pure endowment
of so much as said premium will purchase, determined
by the age of the insured at the date of default in the
payment of premiums on the original policy, and the
table of mortality and interest aforesaid, which amount
shall be paid at end of original term of endowment, if
the insured shall then be alive.''

The conflicting contentions of respondent and ap-
pellant upon this proposition may thus be briefly
stated: On the part of the plaintiff it is insisted that
this non-forfeiture statute, herein quoted, applies to
all character of insurance and embraces benefit certifi-

cates of the character involved in this proceeding, issued by defendant, and that the statute presents a rule for the ascertainment of the net value of a policy, without regard to whatever premiums or assessments the insured may have contracted to pay, in other words, that the provisions are arbitrary and fix a statutory net value applicable to all character of insurance. Appellant contends that fraternal beneficiary associations and the certificates issued by them to their members do not come within the scope or meaning of the act of May 19, 1879, known as the "non-forfeiture insurance statute," which in an amended form is now section 7897, supra, and that the non-forfeiture provisions of that section are only applicable to "ordinary life policies," "limited payment life policies," and "continued payment endowment policies, payable at a certain time, or at death," and the contract sued on does not come within any of said classes.

The contentions of respondent and appellant as above indicated substantially embrace the only vital and important proposition with which we are confronted, and its correct and proper solution must be sought in the fair and reasonable application of the law to the subject to which the respective contentions are directed.

At the very threshold of the discussion of the legal propositions involved in this controversy it is well to first fix definitely the nature and character of the defendant association. The Supreme Lodge Knights of Pythias is the defendant and appellant in this cause. It must not be overlooked that the plaintiff is seeking to recover a judgment against this defendant, the Supreme Lodge, Knights of Pythias, and that it is by no means a proceeding against the Endowment Rank of that association. The Supreme Lodge Knights of Pythias was first organized under a general act of Congress, authorizing the formation of such society for

benevolent purposes, in the District of Columbia.    It was substantially re-incorporated by a special act of Congress.   Its charter provides that its property and assets shall not be divided among its members, but shall descend to their successors.    It further declares that the association shall not be conducted for gain or profit, and that its purpose shall be fraternal and benevolent. It has no lawful power to engage in the general life insurance business, or to issue ordinary life insurance policies for gain or profit to its members.

In this case it is expressly admitted by stipulation that the defendant at the time of the death of Jacob Westerman, in whose favor the certificate here sued on was issued, and long prior thereto, was authorized by the superintendent of insurance of the State of Missouri to do business in this state as a fraternal beneficiary association.

It appears from the constitution adopted by the defendant, Supreme Lodge, Knights of Pythias, which was offered in evidence, that the defendant has a lodge system as a secret society with a ritualistic form of work and a representative form of government,   and that it is organized and carried on for the sole benefit of its members and their beneficiaries and not for profit; that the certificates issued by the defendant through the Endowment Rank provide that the benefits shall be payable alone to the families, heirs, blood relatives or persons dependent upon the members, and that the funds from which the payment of such benefits are made and the expenses of the association are derived from assessments and dues collected from the members of such rank who are eligible to obtain benefit certificates.

That the defendant in this cause is a fraternal beneficiary association, we are of the opinion there can be no dispute; hence, we take it, that furnishes the reason for the contention of respondent being directed to the

Endowment Rank, and insisting that such rank should be treated as a separate organization engaged in purely regular or old-line insurance business. However, as suggested by one of the learned counsel for appellant, it must not be overlooked that the certificate sued on was issued by the Supreme Lodge, Knights of Pythias, and not by the Endowment Rank. The suit is against the Supreme Lodge, Knights .of Pythias, not against any portions of its members designated as belonging to the Endowment Rank. The contract is the contract of the association. A careful analysis of the record before us which discloses the organization of defendant association, indicates very clearly that the Endowment Rank is not a separate organization or society formed' among the members of the defendant fraternal association. It is simply a designation of those of the members of the fraternal beneficiary association who have chosen to apply for and receive the benefit certificates provided for by the association. It does not exist as a separate institution. It is a part and parcel of the Supreme Lodge; whatever business it transacts is done under the supervision of the Supreme Lodge. It is under the control of the Supreme Lodge and all contracts made by members of the order for certificates are made by the board of control in the name of and for the Supreme Lodge, Knights of Pythias. All the laws, rules and regulations applicable to members of the association of the Endowment Rank are enacted by the Supreme Lodge in which all of the members participate in convention assembled.

The statute does not contemplate that all the members of associations of this character must have benefit certificates of the same kind. It is only essential to constitute the defendant a fraternal beneficiary association that it be organized for the benefit of its members, and not for gain or profit. It must have a representative form of government and ritualtistic form of work;

having these essential requirements such association is authorized to issue benefit certificates to any of its members and it is by no means a condition precedent to make it a fraternal beneficiary association as contemplated by the statute, that it shall issue such benefit certificates to each and every one of the members of the association. The true test as to whether this is a fraternal beneficiary association is, is it formed or organized and is it carried on for the sole benefit of its members and their beneficiaries and not for profit? Has it a lodge system with a ritualistic form of work and a representative form of government? By no means is there any condition embraced in this test that all or any part of the members of such association have received certificates. The mere fact that members of the association, who are entitled upon application to receive certificates from the defendant association, are designated as the Endowment Rank, falls far short of making them a separate and distinct organization so formed for the purpose of issuing insurance policies. Those who belong to the endowment class are not members of that class by reason of having joined a distinct society or separate organization, but are designated as belonging to that class by reason of being members of the order of Knights of Pythias. All of the contracts of the defendant association and the benefit certificates issued to members belonging to the endowment class are predicated upon · the act of Congress creating it and fixing the scope and purposes of the business in which it may engage. The endowment class under the charter of the defendant association is directly under the supervision and control of the Supreme Lodge, Knights of Pythias. Those designated as the endowment class of this association are only authorized to act by virtue of the provisions of the charter of the order of Knights of Pythias, and every act performed and the issuing of

the benefit certificates are only given force and vitality from the organized association of the Knights of Pythias. It is unlike a separate and distinct organization which has the sole and absolute control of the business of such separate organization, and the only connection that such distinct organization has with some fraternal beneficiary association is to limit the membership of such separate organization to those who are members in good standing in the main fraternal organization.

That is not this case. Here we have an Endowment Rank which terms are simply used to designate those holding benefit certificates, which designated class are under the control of a board which are elected by the entire membership of the Supreme Lodge. It certainly would not be insisted that if this fraternal organization would undertake to execute and put in force powers authorized by its charter, such as issuing benefit certificates, should select a committee composed of its members to transact such business and do as is done by the Endowment Rank, report their proceedings to the main organization, such committee and those holding certificates with whom they had transacted business for the association, would be treated as a separate and distinct organization.

After a careful consideration of the disclosures of the record now before us, we see no escape from the conclusion that the benefit certificate in suit must be treated as one issued by a fraternal beneficiary association. It was so treated by the insurance department of the state government and it is expressly admitted that this association was authorized by the superintendent of insurance at the time of the death of Jacob Westerman and long prior thereto to do business in this state as such fraternal beneficiary association.

This brings us to the main proposition in this cause, that is as to whether or not the benefit certificate issued

to Jacob Westerman falls within the scope or meaning
of the act of May 19, 1879, known as the non-forfeiture
insurance statute, which in a slightly amended form is
now section 7897 of the Revised Statutes of 1899. In
other words, the crucial question presented is whether
or not the policy or benefit certificates upon which this
suit is predicated should be treated as a contract for
regular or old-line insurance to which the non-forfei-
ture statute, section 7897, must be applied.

To fully comprehend the proposition now in hand
it is well to first fix in our minds the nature and charac-
ter of this certificate. The record discloses and there is
no dispute upon that question, that plaintiff's husband,
J. P. Westerman, being a member of a subordinate
lodge of the order of Knights of Pythias, on the 13th
of August, 1883, obtained a benefit certificate for the
sum of $3,000, which was the maximum certificate then
issued by the society. Afterwards, in 1892, the laws
were amended so as to authorize certificates for an
amount not exceeding $5,000; and on the 17th of May,
1893, Westerman presented his application to the de-
fendant, as follows: "I am now insured in the endow-
ment rank for $3,000, and desire to increase to $5,000,"
or $2,000 additional. Accordingly, a new certificate was
issued to him including the $3,000 originally applied for
and the increase of $2,000, making a total of $5,000, be-
ing the certificate sued upon. Subsequently, in 1894,
the association again fixed the maximum at $3,000.

The application, certificate and laws of the order
provide that a failure on the part of a member to make
all monthly payments, and to pay all assessments and
dues as required, or a failure on his part to maintain
his membership in good standing in a subordinate lodge
of the Knights of Pythias, shall render the certificate
and all claims thereunder null and void.

The certificate issued to Westerman recited that
it is issued in consideration of the payment by him of

the prescribed membership fee, and of the payment thereafter of all assessments and dues as required, and of the full compliance by him with all the conditions contained in said certificate, and with the laws governing the Endowment Rank of the Knights of Pythias, then in force, or that might thereafter be enacted by the Supreme Lodge of the Knights of Pythias; and further, that he should remain in good standing in a subordinate lodge of the order, in which event, at his death, there should be paid to his widow the sum of $5,000.

It was agreed and is so stated in the certificate, that the beneficiary therein named should acquire no interest whatever in said certificate, nor in the endowment fund until the benefit should lawfully accrue to her by reason of the death of said member. The right to change the beneficiary is also expressly reserved. The certificate further states that in the event of a violation of any of the conditions or requirments of the laws of the order then in force, or that might thereafter be enacted, governing said rank, said certificate and all claims thereunder should be null and void, and the defendant should not be liable for the sum mentioned in the said certificate or any part thereof. The right is also reserved to change the amount of the monthly payments, and to make special assessments for the purpose of paying liabilities arising from death claims whenever necessary.

The member, at the time the certificate was issued in 1893, paid at the rate of $6.30 per month. Afterwards, in 1894, the amount of the monthly payment was increased twenty-five cents, or five cents per thousand, making $6.55 per month. In 1892 a special assessment was levied on all the members of the rank, which assessment was paid by Westerman. In 1901 another special assessment was levied against all who were then members of the Endowment Rank. Westerman paid his assessments until June 10, 1899, at which time he made

196 Sup.—45

default and thereafter wholly failed to pay any monthly dues or assessments. He died in January, 1900.

It is clear that, under the disclosures of the record as above indicated, the benefit certificate sued on, under the express provisions contained in it, and in accordance with the rules of the order under which it was issued, ceased to be of any force and effect at the time Westerman failed to pay the assessment and dues required by the laws of the defendant, and it was not in force at the time of his death unless the business conducted by the defendant, and the contract sued on come within the provisions of the non-forfeiture insurance statute, first enacted in 1879, and now contained in an amended form in section 7897 of the Revised Statutes of 1899.

It is entirely unnecessary to state or even suggest the great importance of reaching a correct solution of the propositions involved. The statement of the proposition clearly indicates its great importance. The question is one of first impression in this court, and as was elsewhere said by a learned and esteemed judge of this court, "The importance of it cannot be overstated. Its determination affects the rights of perhaps a greater number of people than the determination of almost any other question in the law could possibly affect them." We are not without light to guide us in the proper solution of this proposition. Learned counsel for both respondent and appellant have displayed great energy and industry as well as ability in the presentation of this question. We have carefully considered every phase of this question as presented by counsel and we see no escape from the conclusion that the non-forfeiture statute, section 7897, heretofore indicated, has no application to benefit certificates of the character upon which this suit is based. We predicate this conclusion upon two reasons, first, that the terms of the statute, when correctly interpreted, do not embrace policies or

certificates of insurance of the character and nature in suit. Secondly, that the benefit certificate involved in this suit was issued by a fraternal beneficiary association and under the law in force at the time of the default in the payment of the monthly dues and assessments (which were essential under the express provisions of the certificate to keep it in force) the defendant fraternal beneficiary association was exempt from the provisions of that section.

We take it that in assigning reasons upon which to rest the conclusions reached in this case the practical construction of the statutes applicable to the insurance laws of this State, given by the department of state government, which has the direct supervision of the Insurance Department of the State, as well as the manner of all insurance companies and other associations in conducting the business of insurance in which they are engaged in this State, should not be ignored. The non-forfeiture statute has been in force for more than twenty-five years. The defendant fraternal beneficiary association was authorized to do business in this state as a fraternal beneficiary association, and as such has been engaged in issuing benefit certificates of a similar nature and character to that involved in this proceeding. Numerous other fraternal beneficiary associations are now doing business in this state and doubtless there have been many lapses in the payment of assessments by members of fraternal beneficiary societies holding benefit certificates; notwithstanding these lapses they have proceeded with the transaction of their business under the authority of the insurance department of this state, and while it is the duty of such department to protect the policy-holders in insurance companies, yet it has never been claimed by any of the state officials superintending that department that the non-forfeiture statute, which has universally been construed to apply to regular or old-line insurance, was applicable to bene-

fit certificates issued by fraternal beneficiary associations, and that such associations had been dealing unjustly with the holders of certificates who had permitted them to lapse. This is the first case, twenty-five years after the enactment of the non-forfeiture statute, in which an effort is made to apply it to certificates issued by fraternal beneficiary associations. Therefore we have not only the recognition of the Insurance Department of the State that this non-forfeiture statute was not applicable to certificates of this character, but as well it is the consensus of opinion on the part of the people as well as the legal profession that such statute has no application to certificates of this nature and character. And while the fact that for years past many lapses in the payment of monthly assessments and dues in these associations have occurred and that this is the first case in which it was sought to enforce the application of the non-forfeiture statute, arising as it does twenty-five years after the adoption of the statute, falls far short, standing alone, of furnishing a satisfactory reason for the conclusion reached, and by no means should such fact be made the sole basis upon which to rest such conclusion, but while that is true it at least, if other reasons can be assigned why the non-forfeiture statute is not applicable, would furnish some aid and support to the soundness of such reasons.

In Ross v. Railroad, 111 Mo. l. c. 25, BLACK, J., in discussing the proper and correct interpretation of a statute then before the court, quoted approvingly Endlich on the Interpretation of Statutes, section 83, which uses this language: "A statute applicable to a large trade or business should, if possible, be construed, not according to the strictest and nicest interpretation of the language, but according to a reasonable and business interpretation of it, with regard to the trade or business with which it is dealing." In that case the learned and esteemed judge, during the course of the

opinion, further discussed the rule as applicable to the interpretation of statutes, and said: "Again, where such a statute as this has been interpreted by those executive officers whose duty it is to enforce it, and their construction has been acted upon for any considerable time, due regard should be paid to such construction. While the rulings of such officers are not conclusive upon the courts, still their construction of the law is entitled to weight, especially where there is a doubt as to the meaning of the law. Says the author just cited, after speaking of the deference paid to the practice in lower courts, 'But of almost equal dignity is the practical construction put upon an act by the governmental officers particularly charged with its execution, especially where so long continued as to have grown into a rule of departmental practice. Thus the construction of a statute adopted and acted upon, by the executive, in the execution of his duty to give effect to the laws, or by the Secretary of the Treasury, or the construction of a general insurance law of a state by its attorneys-general and other officers required to act under it, will, in cases of doubt and ambiguity . . . be adopted by the courts, or, at least, not disregarded by them, except for cogent reasons.' [Endlich on Interpretation of Statutes, sec. 360; Union Ins. Co. v. Hoge, 21 How. 35.]"

In Venable v. Railroad, 112 Mo. 103, the vital question involved in that proceeding was as to the necessity of the wife joining in a deed to a railway company for land to be used by such railroad for public use, that it, as a right of way, or the necessity of making her a party to a proceeding in a condemnation suit. This court very clearly indicated its views as to the weight to be attached to a general understanding and recognition of what the law is and a constant practice under it in determining a legal proposition to which this universal recognition of the law may reasonably be ap-

plied to the subject involved in the controversy. It was there said: "This is the first suit in this State, that we are aware of, that in circumstances like the present a suit for dower has been brought against a railroad company. The common consent and opinion of the legal profession in this state has been that it was not necessary to make a wife a party in order to bar her inchoate right of dower, either as a railroad right of way or other public highway. This of itself is a very pregnant circumstance, and very good evidence of what the law is." In support of the announcement of this doctrine the case of Scanlan v. Childs, 33 Wis. 663, was quoted with approval. It was there said: "The general understanding of a law and constant practice under it, for a period of over twenty years, by all officers charged with the execution of it, unquestioned by any public or private action, is strong if not conclusive evidence of the true meaning." The case of Packard v. Richardson, 17 Mass. 144, was also cited with approval in support of the doctrine announced by this court. It was there said: "A contemporaneous is generally the best construction of a statute. It gives the sense of a community of the terms made use of by a legislature. If there is ambiguity in the language, the understanding and application of it, when the statute first comes into operation, sanctioned by long acquiescence on the part of the legislature and judicial tribunals, is the strongest evidence that it has been rightly explained in practice."

This non-forfeiture, it is said, was borrowed from the State of Massachusetts. The evils to be remedied and the purposes sought to be accomplished by the enactment of a statute often furnish very material aid in the correct interpretation of such statute, and should exercise a potent influence in determining the meaning of the enactment. The courts have universally considered the mischief intended to be removed or suppressed

and the necessities which induced the enactment as being of great assistance in the correct and proper interpretation of statutes. As was said in State ex rel. Aull v. Field, 112 Mo. 554, "the circumstances of a law, as of a contract, may be resorted to as aids in its construction." Therefore, as an aid to the solution of the proposition presented in this case, and to ascertain the purposes sought by the enactment of the non-forfeiture statute, and as to what class of insurance policies are embraced within its terms, we should seek to ascertain the purposes sought to be accomplished by the enactment of its provisions.

The Supreme Court of Massachusetts, the State from which it is claimed this statute was borrowed, in Connecticut Ins. Co. v. Commonwealth, 133 Mass. l. c. 164, clearly indicates the reasons upon which the enactment of the non-forfeiture law was predicated. In discussing this subject it was there said:

"The simplest form of carrying on the business of life insurance would be for the company to charge the policy-holder each year with the sum which it costs to insure him for that year, which can be ascertained with reasonable certainty by the aid of the accepted tables of mortality. In such case, the relation between the parties would be merely that of insurer and insured. But the general practice of insurers is, instead of charging such sums, which would increase from year to year, to ascertain what these sums would average each year throughout an average life, and to charge each year such average sum. The necessary effect of this practice is that the insured, during the earlier years of the running of his policy, pays more than it costs to insure him, and thus the company accumulates from year to year a fund which in equity is held for the benefit of the policy-holders. It is this feature of the business which gives existence to 'net values' within the meaning of our statutes; the 'net value' of a policy being

represented by a sum which, with compound interest
at the rate of four per cent per annum and with the
addition of future net premiums, will provide for the
payment of the policy when it matures, according to the
'combined experience,' or actuaries' table of mortality.
[St. 1866, c. 33.] The fund thus accumulated is not re-
garded by our laws as the absolute property of the com-
pany, but is held by it as a quasi-trustee, for the bene-
fit of the policy-holders. It has the legal title, as is
the case with all trustees, but holds the property in the
exercise of a franchise or function which permits it to
receive, invest and manage it for the benefit of others.
If the insured violates his contract and forfeits his
policy, the company cannot treat the accumulation upon
his policy as its property, but holds it for his benefit.
Companies doing business upon this plan thus resem-
ble saving banks, exercising the franchise or function
of receiving, investing and managing the money of
numerous policy-holders. It is this franchise or func-
tion which is taxed by the statute we are considering.
The words 'every corporation and association engaged
in the business of life insurance,' do not indicate that
the franchise intended to be taxed was merely the func-
tion of making contracts of insurance, but were in-
tended to designate a class, any member of which would
come within the statute, if it exercised the function
which is made the subject of the excise. The essential
part of the statute, assessing the excise upon the ag-
gregate net values, shows that the legislature did not
intend that it should apply to 'co-operative associa-
tions,' or to any other insurance companies which con-
duct their business so as not to create any 'net values.' ' ''

Mut. Reserve Life Ins. Co. v. Roth, 122 Fed. 853,
while the case was not a fraternal beneficiary associa-
tion case, involved a similar principle to the case at bar,
and discussed the non-forfeiture statute of Missouri
along the line of its applicability to benefit certificates

or what is commonly known as assessment plan or natural premium plan. That was a Missouri case and the opinion was written and announced by a learned and esteemed Missouri judge on the Federal bench, that is, Judge THAYER. In discussing the non-forfeiture statute he said: ''The same motives which led to the enactment of the statute in Massachusetts doubtless led to its enactment in the State of Missouri; that is to say, the Legislature intended to secure to policy-holders the benefit of the reserve on their policies if they had paid 'two full annual premiums,' and not permit the reserve to be forfeited or appropriated by the insurer. It is a well-known fact that the forfeiture of such reserve values for non-payment of premiums had become a source of great profit to insurance companies, because the premiums which they were in the habit of exacting from the insured on life policies were so fixed as to be considerably in excess of the cost of simply carrying the risk from one annual period to another so as to accumulate a reserve. The Legislature deemed it inequitable to deprive the insured of the benefit of payments which he had actually made. . . . This view —that the Legislature had in mind an actual net value which a policy had acquired as the result of the payment of premiums —is strengthened by the fact that, when the statute in question was enacted in Massachusetts and Missouri, there were very few insurance companies then engaged in business which issued policies or benefit certificates on what is now commonly known as the 'assessment plan,' or the 'natural premium plan;' that is to say, companies who limited their assessments to such a sum as was necessary to cover the actual cost of insurance from one renewal period to another. As this form of insurance was little known, and was not practiced to any considerable extent, at the time the statute was adopted, it can hardly be presumed that it was intended to apply to insurance poli-

cies or benefit certificates issued according to that plan, which have in fact no commutable or actual net value. If the act is held applicable to that class of policies, it will not have the equitable operation that it was intended to have, but will in fact have the opposite effect, by giving to the policy-holder something for nothing; that is, insurance which he has never paid for. We cannot, therefore, give the statute that construction, because to do so would, in our judgment, distort it from its true purpose. Statutes should always be construed so as to give effect to the intention of the lawmaker, when that intention can be ascertained with reasonable certainty. For the purpose of ascertaining the intention of the lawmaker, a court is not confined exclusively to the language of the act, although its language must be given due weight, but should consider as well the circumstances which led to its adoption, and the evil that it was designed to remedy. When this is done, it is competent for a court to declare that a thing which may be within the letter of the statute is not governed by the statute, because it is neither within its spirit, nor within the intention of the lawmaker. The reason of the law in such cases, as has sometimes been said, should prevail over its letter.''

Hayden v. Franklin Life Ins. Co., 136 Fed. 285, was a Missouri case, and there was a forfeiture by reason of a failure of the party in whose favor the policy was issued to pay the assessment provided by the policy, and while a certificate issued by a fraternal association was not involved, yet the same principles as are applicable to such associations were involved and fully discussed by the court in that case. The suit was brought by the plaintiff as beneficiary under the policy to recover thereon the sum of $5,000 against defendant on the theory that the policy in question was of the nature of ordinary life insurance policy on the level premium plan fixed at the date of entry, and that

the non-forfeiture statute was applicable to such policy. In that case there is a thorough and exhaustive review of all the authorities upon the subject of life insurance, and the distinction is plainly marked between the old-line ordinary life policies of insurance and those on the assessment plan. The principal mark of distinction as there drawn was, on the one hand, that an old-line policy is a contract where the amount to be paid by the insured is fixed and the premiums to be paid are unalterable, and the liability incurred by the defendant company is also fixed, definite and unchangeable. Under the provisions of the charter in that case the amount of the premiums were not definitely fixed, but when conditions required additional assessments might be made, and it was said by the court in discussing that question, that "counsel for plaintiff in error in his argument, in effect, concedes that, under the policy issued by the Merchants' Life Association, the company had the right, conditioned upon any impairment of the fund, or if the experience of the association justified it, to levy any assessment upon the policy-holders for such amounts as its mortuary experience demonstrated to be requisite. Such is the express provision of the charter. All this being conceded, as it must be, the stipulated payments at definite divisional age-periods do not have the effect to designate it as an ordinary life policy on the level premium plan, and to destroy its quality as a policy on the 'assessment plan.' "

In Haydel v. Mut. Reserve Fund Life Assn., 98 Fed. 200, Judge Adams clearly points out the distinction between a contract of insurance upon the assessment plan and one along the lines of regular or old-line insurance. While the policy under consideration in that case was not wholly similar to the one involved in the case of Haydel v. Insurance Co., heretofore referred to, it was sufficiently so to present, in terms, the like contention made respecting the effect of

a definite reserve premium payable at specified age designations. Judge ADAMS, in discussing the proposition, used this language: "It is assessment insurance where the benefit to be paid is dependent upon the collection of such assessments as may be necessary for paying the amounts insured. In other words, it is assessment insurance if payments to be made by the insured are not fixed—unalterably fixed— by the contract. On the contrary, an old-line policy is a contract where the amount to be paid by the insured is fixed, the premiums to be paid are unalterable, and the liability incurred by the defendant company is also fixed, definite, and unchangeable." On review of this case (104 Fed. 718, 44 C. C. A. 169) Judge THAYER, speaking for the court, said: "While the premium at first reserved is a definite sum, yet by further provisions the executive committee of the company can require the holders of such policies to pay a greater or less sum than that stipulated to be paid on the face of the policies, if the condition of the defendant company at any time renders such action necessary. . . When all the provisions of the contract are considered, it seems to retain all the essential features of assessment insurance."

The ruling in the Federal cases heretofore cited has been approved and followed by the Supreme Court of New York in Crosby v. Mut. Reserve, 78 N. Y. Supp. 237. In Hanford v. Massachusetts Benefit Assn., 122 Mo. 50, Judge BLACK expressed for the court the same view of the policy contract. Speaking of the contention that the policy was a regular old-line premium policy, and, therefore, not within the plan marked out by the statute, he said: "According to the first clause of the seventh condition of the policy the member must make a monthly payment at fixed, definite dates during his life; the amount to be paid bimonthly is also fixed by the table of rates. Thus far these policies are premium

policies, for it does not make these fixed rates, payable at specified dates, assessments, to call them by that name. But is also provided in and by the policies that the board of directors may call for and require the payment of a different amount by giving special notice, and the amount called for may be based upon the current age of the member and the mortality experience of the association. The statute is broad enough to allow assessments to be based on the age of the member, and the frequency of the calls on the mortality experience of the particular association. Our statute calls for an emergency fund and so do these policies. We think these contracts come within the statute and are contracts of insurance on the assessment plan as that plan is defined by the statute. The articles of association and by-laws of the defendant are not before us, and from the facts disclosed by this record, we can only say these policies are assessment plan contracts.''

In the later case of Elliott v. Des Moines Life Association, 163 Mo. 132, Judge GANTT, discussing the policy certificate, which required certain definite estimated amounts to be paid, but which further provided that in case the death rate exceeds the estimated rates the association would pay the deficiency from the emergency or reserve fund until exhausted, when additional premiums might be levied pro rata by the executive board to meet such deficiency, held that it brought the policy within the language and meaning of the statute, ''Which provides that if the payment of the benefit is in any manner or degree dependent upon the collection of an assessment upon persons holding similar contracts, it shall be deemed a contract of insurance upon the assessment plan. While the amount of the benefit is absolutely fixed, and the assessments are definite sums estimated to be sufficient to realize the amount promised, yet it is obvious that in this safety clause is a provision by which an extra assessment or assess-

ments may be made. . . . It seems to us this policy meets every requirement of the statute as to insurance on the assessment plan." The same rule of construction is announced in the still later case of Williams v. St. Louis Life Insurance Company, 97 Mo. App. 449.

The rules of law announced in the cases heretofore cited in which the distinction between the classes of policies are so clearly marked out, are equally applicable to the proposition presented in the case at bar, for the reason that the same distinguishing features upon which the courts in those cases predicate the conclusions reached are present in the benefit certificate upon which this proceeding is based.

We have in the case at bar as a part of the contract of benefit certificate, that the beneficiary will be governed and that his contract shall be controlled by all the laws, rules and regulations of the Supreme Lodge, Knights of Pythias, and a board of control of the Endowment Rank now in force or that may be hereafter from time to time enacted by said Supreme Lodge or board of control, and that the beneficiary would submit to the penalties contained in such laws, rules and regulations.

We find by disclosures in the record, section 1 of article 4 of the constitution of the defendant association provides that every applicant for admission to the Endowment Rank should pay, monthly, an amount provided in the table graduating the monthly payments at a sum from seventy cents to eight dollars per month, according to the age of the member, for certificates ranging from $1,000 to $5,000, and should continue to pay the same amount each month thereafter, as long as he remained a member of the Endowment Rank, unless otherwise provided for by the Supreme Lodge or the board of control of the Endowment Rank; that said constitution also contained section 2 of article 4, herein-

before referred to, which provided that a failure to pay monthly dues should cause a forfeiture of all rights under the certificates, and that the membership might be regained in the manner hereinbefore referred to; that section 3 of article 6 of said constitution further provides as follows: "If at the time of the death of a member of the Endowment Rank, the proceeds of one monthly payment by all the members of said rank shall not be sufficient to pay in full the maximum amount of endowment held under the certificate of said deceased member, then there shall be paid to the beneficiaries an amount equal to the proceeds of one monthly payment by all the remaining members of said Endowment Rank, less ten per cent for expenses; and the payment of said sum, to the beneficiaries, shall be in full of all claims and demands, under and by virtue of said certificate."

It is further disclosed by the record that the laws of the defendant association were amended by the Supreme Lodge in 1894, 1896 and 1898, prior to the death of Jacob Westerman and prior to his failure to make the monthly payment due in June, 1899. These amendments consisted in requiring members of the Endowment Rank to pay five cents for each $1,000 insurance held by him, each month, in addition to the amounts required by the table of rates, and in further providing that if any part of the fund was not required to meet accruing liabilities, it should be invested by the board of control, and in further providing that special assessments should be governed by the same rules and regulations as governed the collection of monthly payments, except that they should be issued on the 15th of each month, and be payable within thirty days. Further changes were made authorizing higher rates to be charged where the occupation of the insured was hazardous or extra hazardous.

It is also disclosed by the record that a special as-

assessment was made upon all members of the Endow-
ment Rank in addition to the monthly payments, on the
15th of July, 1892, and the 15th of May, 1901.

It certainly will not be seriously maintained in the
face of the provisions of the laws, rules and regulations
of the defendant association as above indicated, that
the monthly assessments and dues were unalterably
fixed by the contract, or that the liability incurred by
the defendant association is definitely fixed and un-
changeable.  The constitution, laws and rules of the
defendant fraternal beneficiary association is the very
source of power to make the contract and benefit cer-
tificate which is involved in this proceeding; and it is
clear that under the constitution, laws and rules of the
association, the assessments could be increased and that
special assessments could be made, and that if upon the
death of the member of the association the proceeds of
one monthly payment by all the members  of said rank
shall not be sufficient to  pay  in full the  maximum
amount of indebtedness held under the certificate of
such deceased member, then the payment of an amount
to the beneficiary equal to the proceeds of one month-
ly payment by all the remaining members of such En-
dowment Rank, less ten per cent for expenses, would
operate as a full discharge and payment in full of all
claims and demands under and by virtue of such cer-
tificate.

These were  the  distinguishing  features  clearly
pointed out in the cases heretofore cited, which marked
the distinction between policies and benefit certificates
which were dependent upon collection of assessments
and dues for paying the amounts embraced therein
and the regular and old-line policies contemplated by
the non-forfeiture statute, where the amount to be paid
by the insured is fixed and the premiums to be paid
are unalterable, and the liability incurred by the com-
pany was also definitely fixed and unchangeable.

While it may be said that the cases to which we have referred did not involve fraternal beneficiary insurance, yet it is clear that where the insurance is upon the assessment plan or upon the plan as indicated by the fraternal association in the case at bar, in either case the benefit to be paid was dependent upon the collection of assessments and dues, and we see no escape from the conclusion that the principles announced in those cases are equally applicable to the case at bar. But even without the announcement of an opinion by the courts marking the distinction between benefit certificates issued by beneficiary associations and regular or old-line insurance companies, it will be sufficient to point to the legislation upon the subject. No one can read the numerous acts of the lawmaking power of this State upon the subject of insurance by regular and old-line insurance companies and insurance upon the assessment plan and benefit certificates issued by fraternal beneficiary associations, without noting the clear distinction between policies and benefit certificates issued by such companies. An examination of the judicial history upon this subject clearly discloses that the courts of this State, as well as foreign States, wherever the subject has been brought to their attentiontion, have ever kept in view the distinction between these classes of policies and benefit certificates.

In Commercial League v. People ex rel., 90 Ill. 1. c. 171, the Supreme Court of Illinois very clearly kept in view the distinction applicable to the subject now being discussed. It was there said: "The appellant was, no doubt, an insurance company, in the general and enlarged sense of that term. It issued policies to its members, which were payable upon the death of the member whose life was insured, and did various other acts which are usually done by life insurance companies, but this did not necessarily bring it within the

196 Sup.—46

definition of a life insurance company, as that term is used in the act.''

The same court in Ry. Pass. & Mut. Aid Ass'n v. Robinson, 35 N. E. 174, indicated very clearly that benefit societies are not always included in the general terms, ''insurance companies.'' In discussing that subject it was there said: ''That act subjects every insurance company incorporated or doing business in this State to a variety of rules, and requires of them the performance of various duties, which would be both oppressive and inappropriate as applied to mutual benefit societies. Before any of these societies had been organized, or any law enacted providing for their organization, the Legislature had passed general statutes providing for the organization and government of both fire and life insurance companies, and for the regulation of the entire business of fire and life insurance, and requiring all companies engaged in that business to comply with the rules prescribed by those statutes. Subsequently, when mutual benefit societies began to be organized, and that form of life insurance came into use, it became apparent that it would be impracticable to subject those societies to the same code of rules and regulations already in force for the government of the business of life insurance, and that an essentially new system of rules was required.'' The same distinction is clearly marked by the Supreme Court of Pennsylvania in Commonwealth v. Ben. Association, 137 Pa. St. 412.

This court has in no uncertain or doubtful terms indicated its views as to the distinction between policies and benefit certificates now under discussion, and we frankly confess that if there is no distinction between fraternal beneficiary insurance and regular old-line insurance, and that the policies and benefit certificates issued are so nearly identical that the non-forfeiture statute should be applied to all alike, then we should hasten to retract what was said in Masonic Ben. Ass'n

v. Bunch, 109 Mo. 560.   It was there said by this court, speaking through GANTT, J., that "all the authorities agree that the right of the members of benefit societies in the sums agreed to be paid at death is simply the power to appoint the beneficiary, and that the constitution or charter and the by-laws are the foundation and source of such power.   And it is equally well settled that the beneficiary acquires no vested interest, nor has he any property in the certificate.   He has simply an expectancy, which may be divested by the member by changing the beneficiary. . . . Nor does the possession of the certificate by the beneficiary deprive the member of the right to make the change.   In this respect there is a marked distinction between an ordinary policy of life insurance and a certificate of membership in a benevolent society.   In the former, the beneficiary's interest is a vested right immediately upon the issuing of the policy, whereas in a benevolent society like plaintiff the beneficiary has no vested right in the certificate before the death of the member on whose account it was issued, and the member may change the beneficiary without the consent of the beneficiary."   If respondent's contention in this cause is to be maintained, that the non-forfeiture statute is arbitrary and fixes a net value to all classes of policies and benefit certificates, whether of the regular or old-line or fraternal benevolent association, then manifestly the distinction drawn in the Bunch case is incorrect.

We do not think it will be seriously denied that to whatever insurance policy the non-forfeiture statute can be made applicable, such statute is impliedly embraced in the contract, and immediately upon the issuing of such a policy the beneficiary's interest is a vested right.   The certificate in the Bunch case was substantially in the form of the certificate involved in this proceeding, with the usual provisions upon the failure to pay the assessments, that the certificate should be

null and void and of no effect, and we must admit dullness in comprehension of a statement of a legal proposition, unless this court means to say in the Bunch case, that the benefit certificate issued by a fraternal or benevolent association which looks to the collection of assessments for the payment of the amount embraced in the certificate, is absolutely valueless to the beneficiary unless the conditions are complied with and the death of the member to whom the certificate was issued, takes place.    With the rule announced in the Bunch case we are entirely satisfied; it correctly states the law, and in our opinion clearly markes the distinction that has been universally approved by the courts of this country between benefit certificates of the character in the case at bar and regular or old-line insurance companies. It in effect says to the beneficiary in certificates of the character in the case at bar, that the certificate held by the member to whom it was issued is valueless to you as long as he lives, and is equally valueless upon his death unless there has been no default in the payment of the assessments and dues, which are conditions precedent to the keeping in force of such certificate.

VALLIANT, J., in McMahon v. Maccabees, 151 Mo. 522, in speaking of fraternal beneficiary associations, said, that "it is essential to the life of these societies that the members pay the assessments promptly, as their laws require.  As a general rule, it is cheap insurance, its cost is calculated at the lowest rate at which it can be carried, and if the society is lax and its officers carry the sentimental features of its organization too far into its business management, it is liable to fail of its beneficent purpose."

In Masonic Aid Ass'n v. Waddill, 138 Mo. 628, it was sought in that proceeding by plaintiff, a corporation organized under the laws of the State of Illinois, doing business in this State on the assessment plan, to enjoin the Superintendent of Insurance from levying

and collecting a tax of two per cent upon premiums received by plaintiff in this State under the provisions of section 2 of an act of the General Assembly, approved March 20, 1895, which provided substantially that every insurance company or association not organized under the laws of this State, should annually pay a tax upon the premiums received, whether in cash or in notes, in this State, or on account of business done in this State. It was insisted in that proceeding by the Superintendent of Insurance that the power to levy and collect the tax in question was by section 2, heretofore referred to, conferred upon him. In determining the propositions involved in that proceeding, the court pointed out the provisions of the statute in respect to insurance companies on the assessment plan. It was said by the court in that case, preliminary to the announcement of the rule of law applicable to it, that "such companies are defined, their organization provided for, the terms prescribed upon which foreign corporations of that character shall be permitted to do business in this State, and by section 5869 of that article it is provided 'that nothing herein contained shall subject any corporation doing business under this article to any other provisions or requirements of the general insurance laws of this State, except as distinctly herein set forth.'" The court very clearly pointed out the importance of the distinction between the use of terms in different sections of the statute in the interpretation of such statute in respect to the companies or associations embraced within their terms. The Superintendent of Insurance in that case sought to treat assessments received by the plaintiff that was doing a business in this State upon the assessment plan, as premiums, and bring such assessments within the meaning of section 2 heretofore referred to, which was one of the provisions or requirements of the general insurance law of this State applicable to regular or old-line insurance

companies. Insurance companies on the assessment plan were expressly exempted from the application of the provisions or requirements of the general insurance laws of this State except such as are distinctly set forth in such laws. BRACE, J., speaking for this court, in discussing the proper and correct interpretation of the statutes involved in the proceeding before the court, clearly indicated the importance of considering the terms employed in the provisions of a statute in reaching a conclusion as to the correct and proper interpretation of its true meaning. He said that "the plaintiff and the companies named in the petition are insurance companies on the assessment plan as defined in this article, and under it, doing business in this State. To hold that moneys received by them as 'assessments' under this plan are 'premiums' within the meaning of section 2 (5958), which is now one of the 'provisions or requirements of the general insurance laws of this State,' would not only be to confound terms and disregard the well-defined distinction made between them by the statute as a whole, but to ignore or directly contravene the proviso of section 5869. [Hanford v. Mass. Benefit Ass'n, 122 Mo. 50.] This, of course, cannot be done under ordinary circumstances."

It must be conceded that the mere designation of payments made upon a policy of insurance or a benefit certificate bearing all the marks of regular or old-line insurance, as assessments, does not make them assessments simply to call them by that name; but when it appears, as is disclosed by the record in the case at bar, that the payment of the insurance is dependent upon the payment of the monthly assessments and dues by the members holding certificates, it can be appropriately said that to apply the non-forfeiture statute, which clearly contemplates policies upon which fixed premiums are paid, to the benefit certificate in the case

at bar, which required the payment of monthly assess-
ments and dues to keep it in force, would be not only to
confound terms and disregard the well-defined distinc-
tion made between them by the statute as a whole, but
would be to ignore the true intent and meaning of
such non-forfeiture statute.

The conclusion herein reached that the non-for-
feiture provisions of section 7897 have no application
to the benefit certificate finds additional support by the
provisions of section 7898 relating to the same subject.
This section provides: "At any time after the pay-
ment of three or more full annual premiums, and not
later than sixty days from the beginning of the extend-
ed insurance provided in the preceding section, the
legal holder of a policy may demand of the company,
and the company shall issue, its paid-up policy, which,
in case of an ordinary life policy, shall be for such an
amount as three-fourths of the net value of the reg-
ular policy at the age and date of lapse, computed ac-
cording to actuaries' or combined experience table of
mortality, with interest at the rate of four per cent
per annum, without deduction of indebtedness on ac-
count of said policy, will purchase, applied as a net
single premium upon the said table of mortality and
interest rate aforesaid; and in case of a limited pay-
ment of life policy, or of a continued payment endow-
ment policy, payable at a certain time, or at death, it
shall be for an amount bearing such proportion to the
amount of the original policy as the number of com-
plete annual premiums actually paid shall bear to the
number of such annual premiums stipulated to be paid:
Provided, that from such amount the company shall
have a right to deduct the net reversionary value of
all indebtedness to the company on account of such
policy; and provided further, that the policy-holder
shall, at the time of making demand for such paid-

up policy, surrender the original policy, legally discharged, at the parent office of the company.''

Sections 7897 and 7898 relate to the same subject and should be construed together. Black on Interpretation of Laws, page 204, in treating this subject, says: ''Statutes *in pari materia* are to be construed together; each legislative act is to be interpreted with reference to other acts relating to the same matter or subject. The reasons which support this rule are two-fold. In the first place, all the enactments of the same Legislature on the same general subject-matter are to be regarded as parts of one uniform system. . . . In the course of the entire legislative dealing with the subject we are to discover the progressive development of a uniform and consistent design. . . . In the passage of each act, the legislative body must be supposed to have had in mind and in contemplation the existing legislation on the same subject, and to have shaped its new enactment with reference thereto. . . . Secondly, the rule derives support from the principle which requires that the interpretation of a statute shall be such, if possible, as to avoid any repugnancy or inconsistency between different enactments of the same Legislature. To achieve this result, it is necessary to consider all previous acts relating to the same matters, and to construe the act in hand so as to avoid, as far as may be possible, any conflict between them.''

It is but a common rule of interpretation of a statute that the courts in seeking the true intent, meaning and purpose of one section, will call to its aid the provisions of other sections of the same statute treating of the same subject. This court would not be warranted in ignoring the provisions of section 7898, if its provisions in any way indicate the nature and character of policies contemplated by the non-forfeiture section (7897). It is immaterial that they are separate sections; they must be construed, covering as they

do, the same subject-matter, as though their provisions were embraced in one section. That section 7898 clearly indicates that the policies contemplated by the non-forfeiture section are such as will admit of the holder of a policy to obtain a paid-up policy as provided by the statute, is too plain for discussion. In other words, the policies contemplated in the non-forfeiture section must be broad enough to cover both extended insurance by reason of the net value of the policy as provided by that section and the right to a paid-up policy as provided in section 7898. The right to a paid-up policy is as broad as the right to extended insurance, and we see no escape from the conclusion that no other policy can be meant to be embraced in section 7897 than those which will admit of the enforcement of the rights so clearly pointed out in the two sections treating of the subject. The provisions of section 7898 make it so apparent as to what class of policies are meant to be embraced in section 7897 that it does not admit of dispute. It plainly recognizes the right of extended insurance, and then in effect says, to the holder of a policy, if you do not care to take extended insurance any time within sixty days from the beginning of your extended insurance as provided by section 7897, you may demand a paid-up policy; hence the policy contemplated by section 7897 must be of that nature and character as will cover either right the policy-holder may elect to avail himself of when the conditions designated by the statute confront him. With this interpretation of sections 7897 and 7898, it is only necessary to add that no one will seriously contend that the benefit certificate upon which this suit is brought is that character of policy contemplated by the non-forfeiture section, and broad enough to cover both extended insurance purchased by the net value of the policy at the time of the forfeiture and the right to a paid-up policy. It therefore must be held that the

benefit certificate sued on does not fall either within that class of policies known and recognized in insurance circles as will admit of the holder obtaining a paid-up policy as provided in section 7898, to which alone the non-forfeiture provisions of section 7897 are directed and made applicable.

It is insisted, however, by learned counsel for respondent that this is not a correct interpretation of the non-forfeiture law for the reason that no kind of policies are excepted from the non-forfeiture statute, hence all kinds are embraced within it. This reasoning is ingenious, but by no means sound. The two sections of statute (and they must necessarily be construed together) in plain and unambiguous terms point out the character of policies to which the non-forfeiture law is meant to apply, and the rights to which the policy-holder is entitled; hence, it would be illogical to say that it embraced others of an entirely different character. If that was true it would simply amount to importing into the statute a character of policy which, if forfeited, would not admit of the full enforcement of the rights guaranteed by the provisions of the statute.

II.   This brings us to the consideration of the second and only remaining branch of the proposition presented in this controversy, or rather to the discussion of the soundness of the second reason assigned, as heretofore indicated, why the non-forfeiture section was not applicable to the benefit certificate sued on in this proceeding; that is, the benefit certificate in suit having been issued by a fraternal beneficiary association, under the law in force at the time of the default in the payment of the monthly dues and assessments (which were essential under the express provisions of the certificate to keep it in force), the defendant fraternal beneficiary association was exempted from the provisions of that section.

No one can read the numerous acts of the Legislature from the time fraternal beneficiary associations were authorized to do business in this State without being convinced beyond question that it has ever been the policy of this State to exempt such associations from the general insurance laws applicable to regular or old-line insurance. The reasonable limits of this opinion must be our apology for failing to fully review all the legislation upon the subject of fraternal beneficiary associations, as well as our failure to reproduce the numerous acts of the General Assembly treating of the subject, hence we must be content with a brief reference to such legislation.

The first act of the Legislature respecting associations of this character was enacted in 1868. This enactment was followed by numerous acts amending and making other changes in the law applicable to fraternal beneficiary associations. It is unnecessary, however, to burden this opinion with a recitation of the provisions of these numerous acts prior to the act of 1881, for they shed no light upon the question involved in this controversy. The act of March 8, 1881, Laws of 1881, page 87, authorized the issuance of benefit certificates by benevolent or charitable associations or societies, and expressly provided that an association issuing a certificate for the payment of any sum of money to become due and payable upon the death of a member from the proceeds and assessments or dues collected from the member thereof should not be deemed insurance companies or subject to the general insurance laws of the State. This enactment authorized the transaction of business in this State by associations incorporated under the laws of this State or any other State or Territory of the United States. Thus the law remained until the revision of 1889, when the provisions respecting the right of foreign associations to do business in this State under the act of 1881, were omitted. Thus

the law stood from 1889 until 1897, when the General Assembly, at its session in 1897 (Laws 1897, p. 132), enacted the law which is now in force defining and regulating fraternal beneficiary societies, repealing sections 2823 and 2824 of the Revised Statutes 1889, and substituting and enacting new sections in lieu thereof. The first section of that act provided that ''such associations shall be governed by this act and shall be exempt from the provisions of the insurance laws of this State, and shall not pay a corporation or other tax, and no law hereafter passed shall be applied to them unless they be expressly designated therein. And such fraternal beneficial association may create, maintain, disburse and apply a reserve or emergency fund in accordance with its constitution or by laws.'' And the second section of the act was as follows: ''Sec. 2. All such associations coming within the description as set forth in section 1 of this act, organized under the laws of this or any other State, province or Territory, and now doing business in this State, may continue such business, provided that they hereafter comply with the provisions of this act regulating annual reports and the designation of the Superintendent of the Insurance Department as the person upon whom process may be served, as hereinafter provided.''

The record discloses that it was while the law of 1881 was in force which authorized the issuance of benefit certificates by fraternal associations, whether organized under the laws of this State or any other State or Territory, and which exempted such association from the application of the general insurance laws, that the original certificate for $3,000 was issued to Jacob Westerman. The date of that certificate was the 13th day of August, 1883. In 1893 the rules and regulations of the defendant association had been so changed as to authorize the issuance of certificates for $5,000, and under this change of rules, as is indicated

by the application, Mr. Westerman did not apply for a new contract or new certificate, unless by legal construction it is to be made a new contract, and a new certificate. He stated in his application: "I am now insured in the Endowment Rank for $3,000 and desire to increase to $5,000, or two additional thousands." This benefit certificate was issued in 1893 for the increased amount of $2,000, including the former amount of $3,000, making a total of $5,000. The record also discloses that after the enactment of the law of 1897, the defendant association of which Mr. Westerman was a member, complied with the provisions of that act, and that Mr. Westerman continued to pay his assessments and dues, as provided by his contract, for a period of nearly three years after the law of 1897 was in full force.

The contention of respondent is that, upon such state of facts and the law correctly applied to it, there being no law in force in this State from 1889 to 1897 authorizing the defendant association to transact business as a fraternal beneficiary association, and the benefit certificate sued on bearing date in the year 1893, the non-forfeiture statute heretofore referred to is applicable to and must govern the benefit certificate in suit. This contention is predicated upon the doctrine announced by MARSHALL, J., speaking for this court in the case of Kern v. Legion of Honor, 167 Mo. 471. It is true in that case the provisions of the general insurance law, which provided "that no representation in procuring a policy of insurance shall be deemed material or avoid the policy unless the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable, and whether it so contributed shall be a question for the jury," was held applicable to that benefit certificate. But we take it that it by no means necessarily follows that the non-forfeiture statute is alike,

and also must be made applicable to benefit certificates of that character. The application of that provision of the general insurance laws or the provisions in respect to suicide constituting no defense to certificates of this character, falls far short of meaning that every provision of the general insurance law shall be applied to certificates of this character, and it may for the purposes of this case be conceded that certain provisions of the general insurance laws may be broad enough to embrace within such provisions certificates of the character issued by the defendant association, yet this would not authorize this court to apply the provisions of the non-forfeiture statute to a benefit certificate, which as heretofore pointed out, is not embraced or contemplated by the provisions of such non-forfeiture statute.

The case of Sams v. Railroad, 174 Mo. l. c. 69, is illustrative of this question. The vital proposition involved in that case was whether the term "railroad" in the statute included street railroads. A number of cases were cited in the opinion to show that in many instances an act concerning railroads had been held to include street railroads. Judge VALLIANT, speaking for this court, we think very clearly pointed out the true rule. He said: "For some purposes the law recognizes several species of railroads and railroad companies, and recognizes a distinction between a 'railroad' and a 'street railroad.' Statutes using the general term, 'railroad' may or may not apply to a 'street railroad.' When the word 'railroad' is used in a statute, if we want to know if it is intended to embrace in its meaning a street railroad, we must look at the connection in which it is used. . . . Many of the statutes of this State concerning railroads apply to street railroads, while other statutes, in very nature of the case, could not do so." Judge GANTT, in his dissenting opinion in that case, fully recognized the application of the

rule, and he said: "That there are many provisions of the various acts in regard to railroads which do not apply to street railroads may be and is conceded."

While it may be that at the date of the renewal of the certificate in suit, which simply had for its purpose to increase the amount of insurance $2,000, there was no law in this State which authorized a foreign fraternal beneficiary association to transact business, yet it is manifest that the certificate issued was similar to those issued by fraternal organizations authorized to do business. Its source of power to issue the certificate was by the act of Congress making it a fraternal beneficiary association. There is no pretense that it had complied with the law to transact business under the general insurance laws of the State. It never held itself out to the public as a regular insurance company; it limited the issuance of its certificates to its members; it was not organized for gain or profit; there were no policy-holders who could participate in any profit, and whether or not it was authorized to do business in this State, it is apparent that, Mr. Westerman being a member of the association, it was clearly his intention to contract with it as a fraternal association and not as a regular or old-line insurance company. The state department did not regard it as doing an insurance business along regular lines contemplated by the general insurance laws. It had not complied with the provisions of the law applicable to regular insurance companies, and there was no effort by the state department to challenge its authority to do business in this State, as was done in the case of State ex rel. v. Merchant's Ex. Mut. Benev. Society, 72 Mo. 146. Therefore, in harmony with the principles announced in the Sams case, in determining whether the non-forfeiture section of the statute is applicable to a policy or benefit certificate, we must look to the nature and character of the certificate issued and thus determine whether such cer-

tificates are embraced within the meaning of such non-forfeiture statute. We are unwilling to say that the benefit certificate involved in this proceeding was issued in such form and under such circumstances as is disclosed by the record, to warrant this court in holding that it is embraced within the meaning of the non-forfeiture statute and falls within its provisions. Aside from all that has been heretofore said in relation to this certificate, we are of the opinion that upon the disclosures of the record in this proceeding, the rights of the parties in this certificate of insurance are governed by the act of 1897. The benefit certificate in suit upon its face discloses that it was taken subject to the laws, rules and regulations of the Supreme Lodge, Knights of Pythias, then in force or that might thereafter be enacted. Mr. Westerman in his application agreed that his contract should be controlled by the laws now in force or that might hereafter from time to time be enacted by said Supreme Lodge. The certificate states upon its face that the beneficiary named therein should have no vested right in or under it until the death of the member. It further stipulates that the member may change the beneficiary at any time he might desire so to do. It is conceded of course that his right to change the beneficiary would be limited to making such change as to persons that occupied such relation to him as would bring them within the scope and purposes of the society.

As before stated, the defendant association complied with the provisions of the act of 1897 and was doing business in this State under its authority from and after its passage. Westerman continued to pay assessments and dues after the defendant association complied with the provisions of the act of 1897 until June 10, 1899. Mr. Westerman, to whom this certificate was issued, died in 1900, and the act of 1897, under which

the defendant had been acting for more than three years, was in full force and effect.

It is clear under the well settled-law of this State that plaintiff had no vested right in the benefit certificate in suit at the time of the passage of the act of 1897. This was expressly decided in Masonic Ben. Ass'n v. Bunch, supra, and in that case the certificate involved was issued by a foreign benevolent association prior to the act of 1881, which is referred to in the case of Kern v. Legion of Honor, 167 Mo. 471, and which authorized fraternal associations to do business in this State and exempted them from the general insurance laws. Hence we take it that the doctrine announced in the Bunch case was predicated upon the form of the benefit certificate.

In Wells v. Mutual Benefit Ass'n, 126 Mo. 630, the benefit certificate was issued by a foreign benevolent society in August, 1879, and prior to the act of 1881. The same doctrine announced in the Bunch case was held applicable to that case, and BURGESS, J., speaking for the court, said: "That plaintiff had no vested interest or property in the certificate at the time of its surrender by her husband, but simply an expectancy which might have been divested by her husband by surrendering it, seems well-settled law. It was so held by this court in Masonic, etc., Ass'n v. Bunch, 109 Mo. 560, after an exhaustive review of all the authorities." Both of those cases were cited approvingly by MARSHALL, J., in Casualty Co. v. Kacer, 169 Mo. 301.

The vital question in Morton v. Royal Tribe of Joseph, 93 Mo. App. 78, was as to the application of the suicide provision in the general insurance law, and as to whether the law of 1889, applicable to life insurance, should be applied to the certificate in suit, or whether it was governed by the act of 1897 relating to fraternal beneficiary associations. The certificate declared on in the first count of the petition was issued May 5, 1896, and prior to the passage of the law of 1897. It was

196 Sup.—47

insisted in that case, as it is in the case at bar, that the certificate should be governed by the law of 1889, and that as no assessments were made to meet losses of the class designated in the certificate, but that the fund was raised by the payment of fixed dues, payable at certain periods, it was old-line insurance, and therefore the suicide clause in the contract should be held inoperative and of no force or effect. Judge BLAND wrote the opinion, which was concurred in by GOODE and BARCLAY,. JJ. In discussing the contention of plaintiff in that case, predicated upon the fact that the certificate was issued prior to the act of 1897, and that the law of 1889 should be applied, the learned judge, speaking for the court, said: ''Appellants contend that this certificate must be governed by the law of 1889 and that as no assessments were made to meet losses of this class, but the fund for that purpose was raised by the payment of periodical dues, it is old-line insurance and that the suicide statute does not apply. If the certificate was like an ordinary policy of insurance, or if it had vested any beneficial interest in any one prior to the death of the member, we would readily yield to the contention, but it is the settled law that neither the member nor the beneficiary had any vested interest in the certificate of insurance prior to the death of the member. [Hofman v. Grand Lodge B. L. F., 73 Mo. App. 47; Grand Lodge A. O. U. W. v. Reneau, 75 Mo. App. 402; Miller v. Grand Lodge O. B. A., 72 Mo. App. 499.] The certifi-- cate was accepted with the condition that it was subject to the constitution and by-laws then in force or that might thereafter be adopted, and the constitution and by-laws then in force and that were thereafter adopted were made a part of the contract. There were no vested rights in any one that could be affected by the change in the constitution and by-laws made in 1898. The member agreed that these amendments might be made, and the evidence is that after they were made

and were promulgated by the supreme officer of the association and published in its official organ, Morton, who is presumed to have had knowledge of the amendment, continued to pay his monthly dues regularly without protest or objection down to the date of his death, so that both by contract and by adoption the certificate was brought under the provisions of the amended constitution and by-laws of 1889, and comes within the provision of the act of 1897.''

Following that case and applying the rule so clearly and correctly announced, to the case at bar, it logically follows that plaintiff in this case at the time the act of 1897 went into effect, had no vested rights in such certificate; hence, the act of 1897 did not impair any of the rights of the plaintiff and its application to the case at bar is not violative of article 2, section 15, of the Constitution of this State, which substantially prohibits the enactment by the General Assembly of any law impairing the obligation of contracts or retrospective in its operation.

In State ex rel. v. Railroad, 9 Mo. App. l. c. 539, it was said by THOMPSON, J., speaking for the court, upon this constitutional provision, that ''provisions of this kind exist, it is believed, in the Constitutions of all the States, and they are generally held to extend only to the prohibiting of legislation of a retrospective character which disturbs rights of a private nature.''

In State ex rel. v. St. Louis County Court, 34 Mo. l. c. 571, Judge BATES, responding to the contentions in that case, said: ''The act is said to be retrospective in its operation. . . . No vested right is taken away or impaired by the act, nor does it impair the obligation of any contract. . . . . No rights had been vested under the previous acts which can be disturbed by this act. The act is not retrospective in its operation.''

In Gladney v. Sydnor, 172 Mo. l. c. 326, after a full review of all the authorities, it was said, that ''the

terms ''retrospective in their operation' as used in our Bill of Rights is one which relates to civil rights and proceedings in civil causes (Ex parte Bethurum, 66 Mo. l. c. 549); hence the well-settled rule deduced from all the authorities is that the 'acts of the Legislature are not to be considered as retrospective, unless they impair rights that are vested, because most civil rights are derived from public laws.' [Rich v. Flanders, 39 N. H. 321, and cases cited and discussed.]''

Following the rules as announced by the authorities herein referred to, if plaintiff in the case at bar had no vested right in the benefit certificate in suit at the time the act of 1897 went into effect, and her husband, Mr. Westerman, continued the payment of his assessments and dues after such law was in force and his default in the payment of such assessments and dues, occurring while such law was in force, we see no escape from the conclusion as was reached in the Morton case, 93 Mo. App. 78, that the benefit certificate in this proceeding is governed by the act of 1897, which expressly exempted fraternal beneficiary associations from the general insurance laws.

In reaching the conclusions in this cause as herein indicated, we are not unmindful of the rules of law announced in the cases by this court which are chiefly relied upon by learned counsel for respondent, that is the case of Toomey v. Knights of Pythias, 147 Mo. 129, and Kern v. Legion of Honor, 167 Mo. 471. It is only necessary to say of these cases, so confidently relied upon by respondent, that a careful analysis of them makes manifest the distinguishing features from the case at bar. In the first place, as heretofore pointed out, in neither of them was the question in the case at bar, that is, the application of the provisions of the non-forfeiture statute to fraternal beneficiary associations, involved, nor was it discussed. Secondly, there is a marked distinction between the provisions of the general insurance

laws which were made applicable in those cases and the provisions of the non-forfeiture statute, section 7897, which is sought to be applied to the defendant association in this case. Without prolonging this opinion to review and discuss the correctness of the conclusions reached in those cases, it is sufficient to say that the distinction is apparent; on the one hand it may very well be urged that associations issuing certificates of the character now being discussed, are in a general and enlarged sense an insurance company, for the reason that they issue benefit certificates which are payable upon the death of the member, and perform other acts which are similar to those done by old-line insurance companies; hence the provisions of the general insurance law as to false and fraudulent representations at the time of entering into the contract, and "that death by suicide shall constitute no defense," may be considered broad enough to embrace insurance of the character indicated by the certificate in suit. But on the other hand, it by no means follows that the provisions of the non-forfeiture statute, applicable to regular or old-line insurance companies, which was brought into existence for the main purpose of adjusting the equities between the insurer and insured, and particularly applicable to policies of such companies where definite and fixed premiums are charged, and the amount of the insurance is unalterably fixed by the policy, should be applied to a benefit certificate issued by a beneficiary association, regardless of the fact whether such certificates are embraced within the terms of such provisions.

The Toomey case may further be distinguished from the case at bar as was very appropriately said by Judge BLAND, in Morton v. Tribe of Joseph, supra, where it was cited in support of the contention of appellant, "it did not have under review the law of 1897, and is therefore inapplicable to the law and facts which control the case at bar." Again, the disclosures of the

record in the Toomey case are essentially unlike the record in the case at bar. In the opinion it is recited that the amount to be paid was not dependent upon or derived from the assessments upon the members of the association, and that the premiums to be paid by the association were fixed and the sum to be paid to the beneficiary was certain. That is not this case and the record before us makes no such disclosure. It is sufficient to direct attention to the disclosures of the record in this case heretofore pointed out, that the amounts to be paid by the members are not definitely fixed nor is the amount to be paid upon death certain.

We see no necessity for pursuing this subject further. That defendant is a fraternal beneficiary association in contemplation of law, there can be no dispute. This for years was fully recognized by the state department having supervision of all the business pertaining to insurance, and authorized the defendant to maintain the business in which it is engaged as a fraternal beneficiary association. The trial court, by its instructions, practically recognized that it was a fraternal beneficiary association, authorized to do business in this State, and simply in effect submitted the question as to whether it was an insurance company, as contemplated by the general insurance laws of this State. Plaintiff's husband was a member of the association, recognized it as a fraternal beneficiary association; contracted with it as such and was presumed to have complete knowledge of the laws, rules and regulations governing such association, and the necessity of the compliance with such rules and regulations in order to maintain in force his benefit certificate.

Confronted with these disclosures of the record, and entertaining the views as to the law applicable to the proposition involved, it must be held that plaintiff was not entitled to recover.

It is not inappropriate to say that it may be that

some of the numerous beneficiary associations which have been so long recognized and favored by the legislative policy of this State have wandered from the paths of beneficence originally contemplated by their organization, and in many instances respecting the insurance features of such organizations, do not deal justly with their members, yet under the law as it now exists the relief desired and the remedy to be applied for the correction of the evils resulting from the improper conditions surrounding such organizations must be sought in the legislative branch of the state government.

We have thus given expression to our views upon the controlling propositions disclosed by the record, which results in the conclusion that the judgment of the trial court should be reversed, and it is so ordered.

*Gantt* and *Burgess, JJ.,* concur; *Lamm, J.,* concurs in the result; *Brace, C. J.,* dissents; *Valliant, J.,* concurs in the statement of the legal proposition that the non-forfeiture provisions of section 7897 are not applicable to fraternal beneficiary associations, but dissents from the conclusion reached in this cause, that the insurance was fraternal beneficiary insurance; *Graves, J.,* not sitting.